JAMES MURPHY, an Infant, by JOHN MURPHY, His Guardian ad Litem, Respondent, *v.* STEEPLECHASE AMUSEMENT CO., INC., Appellant.

(Submitted March 25, 1929; decided April 16, 1929.)

*Gardiner Conroy* and *Reginald S. Hardy* for appellant. There was no proof of any negligence on the part of the appellant. (*O' Toole* v. *Thousand Island Park Assn.*, 206 App. Div. 31; *Tryon* v. *Chalmers*, 205 App. Div. 816; *Dunning* v. *Jacobs*, 15 Misc. Rep. 85; *Flynn* v. *Central R. R. Co. of N. J.*, 142 N. Y. 439; *Dwyer* v. *Hills Brothers Co.*, 79 App. Div. 45; *Horton* v. *Vulcan*, 13 App. Div. 508; *Camp* v. *Wood*, 76 N. Y. 92; *Hart* v. *Grennell*, 122 N. Y. 371; *Larkin* v. *O' Neill*, 119 N. Y. 221; *Essig* v. *Lumber Operating & Mfg. Co.*, 183 App. Div. 198.) The risks incident to the " flopper " were open and obvious and assumed by the respondent as a matter of law. (*Knottnerus* v. *North Park Street R. Co.*, 93 Mich. 348; *Lumsden* v. *Thompson Scenic Railway Co.*, 130 App. Div. 209; *Barrett* v. *Lake Ontario Beach Imp. Co.*, 174 N. Y. 310; *Matter of Maloney* v. *Cunard Steamship Co.*, 217 N. Y. 278.)

*Charles Kennedy* for respondent. The negligence of the appellant was clearly established. (*Barrett* v. *Lake Ontario Beach Co.*, 174 N. Y. 310; *Breen* v. *N. Y. C. & H. R. R. R. Co.*, 109 N. Y. 297; *Cleveland* v. *Steamboat Co.*, 125 N. Y. 299; *Donnelly* v. *City of Rochester*, 166 N. Y. 315; *Barrett* v. *Lake Ontario Beach Imp. Co.*, 174 N. Y. 310.) The plaintiff did not assume the risk of defendant's negligence. (*Penn Co.* v. *Backes*, 133 Ill. 255; *Dowd* v. *N. Y., O. & W. R. R. Co.*, 170 N. Y. 459; *Lumsden* v. *Thompson Scenic R. R. Co.*, 130 App. Div. 209.)

CARDOZO, Ch. J. The defendant, Steeplechase Amusement Company, maintains an amusement park at Coney Island, New York.

One of the supposed attractions is known as " The Flopper." It is a moving belt, running upward on an inclined plane, on which passengers sit or stand. Many of them are unable to keep their feet because of the movement of the belt, and are thrown backward or aside. The belt runs in a groove, with padded walls on either side to a height of four feet, and with padded flooring

beyond the walls at the same angle as the belt. An electric motor, driven by current furnished by the Brooklyn Edison Company, supplies the needed power.

Plaintiff, a vigorous young man, visited the park with friends. One of them, a young woman, now his wife, stepped upon the moving belt. Plaintiff followed and stepped behind her. As he did so, he felt what he describes as a sudden jerk, and was thrown to the floor. His wife in front and also friends behind him were thrown at the same time. Something more was here, as every one understood, than the slowly-moving escalator that is common in shops and public places. A fall was foreseen as one of the risks of the adventure. There would have been no point to the whole thing, no adventure about it, if the risk had not been there. The very name above the gate, the Flopper, was warning to the timid. If the name was not enough, there was warning more distinct in the experience of others. We are told by the plaintiff's wife that the members of her party stood looking at the sport before joining in it themselves. Some aboard the belt were able, as she viewed them, to sit down with decorum or even to stand and keep their footing; others jumped or fell. The tumbling bodies and the screams and laughter supplied the merriment and fun. " I took a chance," she said when asked whether she thought that a fall might be expected.

Plaintiff took the chance with her, but, less lucky than his companions, suffered a fracture of a knee cap. He states in his complaint that the belt was dangerous to life and limb in that it stopped and started violently and suddenly and was not properly equipped to prevent injuries to persons who were using it without knowledge of its dangers, and in a bill of particulars he adds that it was operated at a fast and dangerous rate of speed and was not supplied with a proper railing, guard or other device to prevent a fall therefrom. No other negligence is charged.

We see no adequate basis for a finding that the belt was out of order. It was already in motion when the plaintiff put his foot on it. He cannot help himself to a verdict in such circumstances by the addition of the facile comment that it threw him with a jerk. One who steps upon a moving belt and finds his heels above his head is in no position to discriminate with nicety between the successive stages of the shock, between the jerk which is a cause and the jerk, accompanying the fall, as an instantaneous effect. There is evidence for the defendant that power was transmitted smoothly, and could not be transmitted otherwise. If the movement was spasmodic, it was an unexplained and, it seems, an inexplicable departure from the normal workings of the mechanism. An aberration so extraordinary, if it is to lay the basis for a verdict, should rest on something firmer than a mere descriptive epithet, a summary of the sensations of a tense and crowded moment (*Matter of Case*, 214 N. Y. 199; *Dochtermann* v. *Brooklyn Heights R. R. Co.*, 32 App. Div. 13, 15; 164 N. Y. 586; *Foley* v. *Boston & Maine R. R. Co.*, 193 Mass. 332, 335; *Work* v. *Boston El. Ry. Co.*, 207 Mass. 447, 448; *N. & W. Ry. Co.* v. *Birchett*, 252 Fed. Rep. 512, 515). But the jerk, if it were established, would add little to the case. Whether the movement of the belt was uniform or irregular, the risk at greatest was a fall. This was the very hazard that was invited and foreseen (*Lumsden* v. *Thompson Scenic Ry. Co.*, 130 App. Div. 209, 212, 213).

*Volenti non fit injuria.* One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary, just as a fencer accepts the risk of a thrust by his antagonist or a spectator at a ball game the chance of contact with the ball (Pollock, Torts [11th ed.], p. 171; *Lumsden* v. *Thompson Scenic Ry. Co.*, *supra; Godfrey* v. *Conn. Co.*, 98 Conn. 63; *Johnson* v. *City of N. Y.*, 186 N. Y. 139, 148; *McFarlane* v. *City of Niagara Falls*, 247 N. Y. 340, 349; cf. 1 Beven, Negligence,

787; Bohlen, Studies in the Law of Torts, p. 443). The antics of the clown are not the paces of the cloistered cleric. The rough and boisterous joke, the horseplay of the crowd, evokes its own guffaws, but they are not the pleasures of tranquillity. The plaintiff was not seeking a retreat for meditation. Visitors were tumbling about the belt to the merriment of onlookers when he made his choice to join them. He took the chance of a like fate, with whatever damage to his body might ensue from such a fall. The timorous may stay at home.

A different case would be here if the dangers inherent in the sport were obscure or unobserved (*Godfrey* v. *Conn. Co., supra; Tantillo* v. *Goldstein Bros. Amusement Co.*, 248 N. Y. 286), or so serious as to justify the belief that precautions of some kind must have been taken to avert them (cf. *O'Callaghan* v. *Dellwood Park Co.*, 242 Ill. 336). Nothing happened to the plaintiff except what common experience tells us may happen at any time as the consequence of a sudden fall. Many a skater or a horseman can rehearse a tale of equal woe. A different case there would also be if the accidents had been so many as to show that the game in its inherent nature was too dangerous to be continued without change. The president of the amusement company says that there had never been such an accident before. A nurse employed at an emergency hospital maintained in connection with the park contradicts him to some extent. She says that on other occasions she had attended patrons of the park who had been injured at the Flopper, how many she could not say. None, however, had been badly injured or had suffered broken bones. Such testimony is not enough to show that the game was a trap for the unwary, too perilous to be endured. According to the defendant's estimate, two hundred and fifty thousand visitors were at the Flopper in a year. Some quota of accidents was to be looked for in so great a mass. One might as well say that a skating rink should be abandoned because skaters sometimes fall.

There is testimony by the plaintiff that he fell upon wood, and not upon a canvas padding. He is strongly contradicted by the photographs and by the witnesses for the defendant, and is without corroboration in the testimony of his companions who were witnesses in his behalf. If his observation was correct, there was a defect in the equipment, and one not obvious or known. The padding should have been kept in repair to break the force of any fall. The case did not go to the jury, however, upon any such theory of the defendant's liability, nor is the defect fairly suggested by the plaintiff's bill of particulars, which limits his complaint. The case went to the jury upon the theory that negligence was dependent upon a sharp and sudden jerk.

The judgment of the Appellate Division and that of the Trial Term should be reversed, and a new trial granted, with costs to abide the event.

POUND, CRANE, LEHMAN, KELLOGG and HUBBS, JJ., concur; O'BRIEN, J., dissents on the authority of *Tantillo* v. *Goldstein Brothers Amusement Co.* (248 N. Y. 286).

Judgments reversed, etc.