RITCHIE-GAMESTER v CITY OF BERKLEY

Docket No. 109633. Argued March 9, 1999 (Calendar No. 3). Decided July 30, 1999.

Jill Ritchie-Gamester brought an action in the Oakland Circuit Court against Halley Mann, the city of Berkley, and others for damages from injuries suffered at a city ice skating rink when Mann collided with her on the rink and knocked her down. The court, Robert L. Templin, J., granted summary disposition for the defendant, finding that an ice rink is inherently dangerous, and that the defendant's actions were not contrary to the rules governing skating. The Court of Appeals, D. E. HOLBROOK JR., P.J., and FITZGERALD and SMOLENSKI, JJ., reversed in an unpublished opinion per curiam, applying an ordinary care standard and finding a genuine issue of material fact regarding whether the defendant was negligent (Docket No. 194024). The defendant appeals.

In an opinion by Justice YOUNG, joined by Chief Justice WEAVER, and Justices TAYLOR and CORRIGAN, the Supreme Court *held*:

Coparticipants in recreational activities owe each other a duty not to act recklessly.

1. Michigan case law generally holds that participants in recreational activities are not liable for every mishap that results in injury; certain risks inhere in all such activities. A person who engages in a recreational activity is temporarily adopting a set of rules that define that particular pastime or sport. In many instances, the person is also suspending the rules that normally govern everyday life.

2. The minimum standard of care for coparticipants in recreational activities is reckless misconduct. Applied in this case, summary disposition was properly granted for the defendant. The plaintiff's allegations amount to, at most, carelessness or ordinary negligence.

Justice BRICKLEY, joined by Justices CAVANAGH and KELLY, concurring, stated that primary assumption of risk is not a basis for holding that coparticipants in sporting activities have only the duty to refrain from acting recklessly. The majority's assertion that a reckless misconduct standard most accurately reflects the actual expectations of participants in recreational activities is wrong. The plain-

tiff did not consent to any conduct of the defendant or the other participants in the free skate. The plaintiff's implied consent in entering into this recreational activity is based on the relationship she entered into with her coparticipants.

Because most recreational activities and sporting events have formal or informal rules regarding safety, it must be assumed that the plaintiff entered into this relationship with her coparticipants with knowledge of these rules and the expectation that they would be obeyed. It cannot be assumed that most participants in such activities consent to others' behavior that is either accidentally or purposefully outside those safety rules. The fact that such rules exist supplies a ready definition of the legal duties that participants in sporting activities must observe: Participants have a tort-enforceable legal duty to one another to obey the safety rules of the sport or activity. If a participant engages in conduct outside these rules, that participant has potentially breached a legal duty to coparticipants, and the factfinder must determine whether the conduct was reasonable under the circumstances.

Participants in a sporting or recreational activity consent to actions by their coparticipants that would not satisfy the strictures of "ordinary care" in everyday activity, but they do not consent to behavior unconstrained by the safety rules of the particular activity. However, because the plaintiff submitted no evidence that the defendant breached any safety rules during free skating, there is no basis on which to say that she violated any safety rules of the free skate, and no basis for finding that she violated any duty that she owed to the plaintiff.

Reversed.

*Schreier & Weiss, P.C.* (by *Sherwin Schreier, Mark Schreier,* and *Alyce M. Haas*), for plaintiff-appellee.

*Becker, Lanctot, McCutcheon, Schoolmaster, Taylor & Hom* (by *Sarah N. Wildgen*); *Gross, Nemeth & Silverman, P.L.C.*, of counsel (by *Mary T. Nemeth*), for defendants-appellants.

Amicus Curiae:

*Fraser, Trebilcock, Davis & Foster, P.C.* (by *Mark A. Bush*), for Michigan Defense Trial Counsel, Inc.

YOUNG, J. We granted leave in this case to consider the appropriate standard of care for those involved in recreational activities. We conclude that coparticipants in recreational activities owe each other a duty not to act recklessly. Because the trial court properly concluded that plaintiff could not show that defendant violated this standard, we reverse the Court of Appeals and reinstate the trial court's grant of summary disposition for defendant.

I

FACTS AND PROCEDURAL BACKGROUND

This case comes to us after a grant of summary disposition for defendant pursuant to MCR 2.116(C)(10), and therefore we must view the facts in the light most favorable to the plaintiff.[1] According to plaintiff, she was skating at the Berkley Ice Arena during an "open skating" period when defendant,[2] then twelve years old, ran into her, knocking her down and causing serious injury to her knee. Plaintiff alleged in her complaint that defendant was skating backwards in a "careless, reckless, and negligent manner" at the time of the collision. In Oakland Circuit Court, plaintiff sued defendant Halley Mann, the city of Berkley (the owner of the rink), and an ice arena employee. The city of Berkley and the ice arena employee were eventually dismissed with prejudice by stipulation of the parties. Mann moved for summary disposition pursuant to MCR 2.116(C)(10) on the grounds that

---

[1] *Kammer Asphalt Paving Co v East China Twp Schools*, 443 Mich 176, 179; 504 NW2d 635 (1993).

[2] We will use the term "defendant" to refer to defendant Halley Mann.

"no negligent acts were carried out by the minor defendant," and that Mann's "touching of the Plaintiff while skating is foreseeable when skating at an ice arena with a number of other skaters as is to be expected." The trial court granted summary disposition for defendant, finding that an ice rink "is inherently dangerous," and that "defendant's actions were not contrary to the rules governing skating." Plaintiff appealed, and the Court of Appeals reversed, applying an "ordinary care" standard and finding a genuine issue of material fact regarding whether defendant was negligent.

For purposes of appeal, defendant admits that there is a question of fact regarding whether her conduct was negligent. Similarly, plaintiff has admitted that defendant's conduct did not rise to the level of recklessness. Thus, the only question before this Court is which standard governs this case: If it is ordinary negligence, we must affirm the Court of Appeals and remand for trial; if it is recklessness, we must reverse the Court of Appeals and reinstate the trial court's grant of summary disposition for defendant.

II

STANDARD OF REVIEW

MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. In deciding a motion pursuant to subrule (C)(10), the trial court considers the affidavits, pleadings, depositions, admissions, and other documentary evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of any material fact exists to warrant a trial. We

review the trial court's decision de novo. *Spiek v Dep't of Transportation,* 456 Mich 331, 337; 572 NW2d 201 (1998); *Chandler v Dowell Schlumberger, Inc,* 456 Mich 395, 397; 572 NW2d 210 (1998).

III

THE CURRENT STATE OF THE LAW

Before we begin our review of the law in this area, we must recognize the limitations of the scope of the case before us. First, there is no allegation that defendant intended the contact with plaintiff, or that she intended plaintiff's injuries. Second, we are not asked to consider the liability of the owner or operator of the ice rink. Thus, our analysis is limited to a determination of the proper standard of care among coparticipants for unintentional conduct in recreational activities.

A. MICHIGAN LAW

We begin by reviewing the current state of Michigan law regarding the appropriate standard of care in the recreational activity context. In one of our older cases, *Williams v Wood,* 260 Mich 322; 244 NW 490 (1932), the plaintiff was injured while fishing. Apparently, the defendant tried to cast but instead hit the plaintiff in the head with the end of his rod, and, in so doing lodged a fish-hook in the plaintiff's eye. The Court reviewed a number of earlier cases from Michigan and other jurisdictions dealing with various outdoor sports, and eventually concluded that the defendant's liability was a question of "ordinary care":

> The general rule that may be deduced from the cases
> hereinbefore cited is that certain risks of accident attend all
> outdoor sports and recovery may be had only if an injury is
> the result of negligence that could and should have been
> avoided by the use of ordinary care. [*Id.* at 327.]

We note that the Court did not explain the relationship between the risks that "attend all outdoor sports" and a participant's duty to coparticipants.

This Court visited a related issue in *Felgner v Anderson*, 375 Mich 23; 133 NW2d 136 (1965). In *Felgner*, one duck hunter shot another accidentally. The injured hunter sued the shooter for negligence. At trial, the defendant requested that the jury be instructed regarding "assumption of risk." *Id.* at 29. The defendant argued that, by engaging in the activity of hunting, the plaintiff had assumed the risk of being shot accidentally and, therefore, that the defendant should not be held liable for the plaintiff's injuries. The trial court refused to so instruct the jury, and the defendant appealed. This Court then held that the "assumption of risk" doctrine did not apply in most negligence actions, concluding instead that it should only be applied in cases in which an employment relationship existed between the parties. *Id.* at 55-56. Importantly, before *Felgner*, the assumption of risk doctrine *was* available to defendants in ordinary negligence actions. *Waltanen v Wiitala*, 361 Mich 504; 105 NW2d 400 (1960). After *Felgner* abolished assumption of the risk in this context, some of the published cases began to move away from the "ordinary care" standard.

In *Overall v Kadella*, 138 Mich App 351; 361 NW2d 352 (1984), on which the trial court relied, the plaintiff was injured when the defendant struck him during

a fight that occurred after an amateur hockey game. The defendant asserted that participants in a hockey game should not be able to sue for injuries incurred during the game, arguing *volenti non fit injuria*.[3] The Court rejected this argument, concluding:

> Participation in a game involves a manifestation of consent to those bodily contacts which are permitted by the rules of the game. Restatement Torts, 2d, § 50, comment b. However, there is general agreement that an intentional act causing injury, which goes beyond what is ordinarily permissible, is an assault and battery for which recovery may be had. 4 Am Jur 2d, Amusements and Exhibitions, § 86, p 211. [*Id.* at 357.]

Defendant cites *Overall* for the proposition that a plaintiff involved in a sport may not sue for injuries caused by conduct that is merely negligent. While some of the language in *Overall* tends to support defendant's position, *Overall* involved an intentional act, and, to the extent it suggested a standard for nonintentional acts, it did so only in dicta.

The dicta from *Overall* became a holding in *Higgins v Pfeiffer*, 215 Mich App 423; 546 NW2d 645 (1996). The plaintiff in *Higgins* was injured by an errant baseball. Before a game, a pitcher and catcher on the plaintiff's team were warming up by throwing

---

[3] Translated literally, this Latin phrase means "to a willing person a wrong is not done." Garner, *Dictionary of Modern Legal Usage* (2d ed) (New York: Oxford Univ Press, 1995), p 921. This maxim is probably most accurately categorized as an expression of the "assumption of risk" doctrine. See *Reedy v Goodin*, 285 Mich 614, 620; 281 NW 377 (1938), overruled in part in *Felgner, supra*. In the most obvious example, a boxer would not be permitted to recover for injuries caused by blows landed within the rules of the boxing match. See, i.e., *McAdams v Windham*, 208 Ala 492; 94 So 742 (1922). It is questionable whether this maxim retains any meaning in this state in light of this Court's abolition of the assumption of the risk doctrine in *Felgner*.

a baseball back and forth. The plaintiff was sitting in the dugout, and the pitcher was throwing toward the dugout. On one particular throw, the ball sailed over the catcher's head and struck the plaintiff in the eye. The plaintiff sued, and the trial court granted summary disposition for the coach, the pitcher, and the catcher. The Court of Appeals affirmed in a two-to-one decision, with the majority concluding that a participant in a sporting activity "consent[s] to the risk of injury inherent in the contest . . . ." *Id.* at 425.[4]

Another Court of Appeals case, decided only weeks before *Higgins*, took a different tack. In *Schmidt v Youngs*, 215 Mich App 222; 544 NW2d 743 (1996), the plaintiff was injured when he was struck by a golf ball. Contrary to the custom of staying behind the ball of the person who is about to hit, the plaintiff had positioned himself some thirty yards in front and to the right of the point where defendant was to play his ball. The defendant shanked the ball and hit the plaintiff. The Court of Appeals affirmed summary disposition for the defendant, quoting Am Jur 2d:

"A person who engages in the game of golf is not an insurer of the safety of others, and he is only required to exercise ordinary care for the safety of persons reasonably within the range of danger.

"Generally, one who is about to strike a golf ball must, in the exercise of ordinary care, give an adequate and timely notice to those who are unaware of his intention to play and who may be endangered by the play. Conversely, there is no duty to give advance warning to persons who are on

---

[4] Defendant relies on *Higgins* for exactly this proposition. However, as the dissenting judge pointed out, the majority relied on out-of-state cases, because there was no Michigan precedent for the majority position. We also note that the majority seemed to ignore the fact that this Court had already articulated an "ordinary care" standard in *Williams, supra.*

contiguous holes or fairways, and not in the line of play, if danger to them is not reasonably to be anticipated. Also, where the person injured was in a place where he should have been reasonably safe, and he was aware of the player's intention to play the ball, an oral or audible warning would have been superfluous and is therefore unnecessary." [4 Am Jur 2d, Amusements and Exhibitions, § 87, pp 211-212 (1995 interim pamphlet).] [215 Mich App 225.]

Although it affirmed summary disposition for the defendant, the Court in *Schmidt* applied an ordinary care standard. In doing so, the Court posited that, while one may consent to the inherent risks of being a spectator or participant in a sport, "one does not ordinarily consent to another's negligence." *Id.* at 228.

On the basis of a review of the published cases in Michigan, there seems to be general agreement that participants in recreational activities are not liable for every mishap that results in injury, and that certain risks inhere in all such activities. Our older opinions generally applied an ordinary care standard. However, the more recent cases from the Court of Appeals appear to be divided regarding the level of duty, or the standard of care, owed to coparticipants.

### B. THE LAW IN OTHER JURISDICTIONS

Other jurisdictions have generally taken one of two approaches to this issue. In a few states, ordinary care continues to be the standard. See *Auckenthaler v Grundmeyer*, 110 Nev 682; 877 P2d 1039 (1994); *Lestina v West Bend Mut Ins Co*, 176 Wis 2d 901; 501 NW2d 28 (1993).[5] In the majority of other jurisdic-

---

[5] See also *Estes v Tripson*, 188 Ariz 93; 932 P2d 1364 (Ariz App, 1997) (applying a "reasonable care" standard on the ground that the Arizona Constitution prohibited adoption of a higher standard).

tions, however, the courts have adopted a "reckless or intentional conduct" or a "wilful and wanton or intentional misconduct" standard. See, e.g., *Jaworski v Kiernan*, 241 Conn 399, 408; 696 A2d 332 (1997) (adopting a "reckless or intentional conduct" standard in a case involving a coed recreational soccer game); *Hoke v Cullinan*, 914 SW2d 335, 337 (Ky, 1995) (adopting a "reckless disregard for the safety of other[s]" standard in a case involving a person hit by a ball between points in a tennis match); *Crawn v Campo*, 136 NJ 494, 497; 643 A2d 600 (1994) (adopting a "reckless or intentional" standard in a case involving a pickup softball game); *Hathaway v Tascosa Country Club, Inc*, 846 SW2d 614, 616 (Tex App, 1993) (adopting a "reckless or intentional" standard in a case involving a golfer struck by another golfer's ball); *Knight v Jewett*, 3 Cal 4th 296, 302; 11 Cal Rptr 2d 2; 834 P2d 696 (1992) (adopting a "reckless or intentional" standard in a case involving an injury suffered in a touch football game); *Marchetti v Kalish*, 53 Ohio St 3d 95; 559 NE2d 699 (1990) (adopting a "reckless or intentional" standard in a case involving children playing "kick the can"); *Gauvin v Clark*, 404 Mass 450, 454; 537 NE2d 94 (1989) (adopting a "reckless disregard of safety" standard in a case involving a college hockey game); *Turcotte v Fell*, 68 NY2d 432; 510 NYS2d 49; 502 NE2d 964 (1986) (adopting a "reckless or intentional" standard in a case involving a professional jockey injured in a fall during a thoroughbred horse race); *Ross v Clouser*, 637 SW2d 11, 14 (Mo, 1982) (adopting a "reckless disregard for the safety of the other player" standard in a case involv-

ing a slow-pitch, church league softball game).[6]

The cases adopting a recklessness standard have recognized different reasons for departing from the ordinary negligence standard. Some courts have held that a participant "assumes the risk" of the activity: "We hold that where individuals engage in recreational or sports activities, they assume the ordinary risks of the activity and cannot recover for any injury unless it can be shown that the other participant's actions were either 'reckless' or 'intentional' . . . ." *Marchetti, supra,* 53 Ohio St 3d 100. In states where assumption of the risk has been abolished, some courts have held that a participant "consents" to conduct normally associated with the activity:

> Traditionally, the participant's conduct was conveniently analyzed in terms of the defensive doctrine of assumption of risk. With the enactment of the comparative negligence statute, however, assumption of risk is no longer an absolute defense. Thus, it has become necessary, and quite proper, when measuring a defendant's duty to a plaintiff to consider the risks assumed by the plaintiff. The shift in analysis is proper because the "doctrine [of assumption of risk] deserves no separate existence (except for express assumption of risk) and is simply a confusing way of stating

---

[6] A few states have limited application of this standard to "contact" sports. See, e.g., *Zurla v Hydel,* 289 Ill App 3d 215, 216-217; 224 Ill Dec 166; 681 NE2d 148 (1997) (In Illinois, a "wilful and wanton" standard applies to contact sports, including soccer and recreational softball, but a "simple negligence" standard applies to golf); *Dotzler v Tuttle,* 234 Neb 176; 449 NW2d 774 (1990) (finding liability for conduct that is "either willful or with a reckless disregard for the safety of the other player" in contact sports such as basketball); *Kabella v Bouschelle,* 100 NM 461, 463; 672 P2d 290 (NM App, 1983) (adopting a "reckless or wilful conduct" standard for contact sports in a case involving an informal tackle football game). See also *Jaworski, supra,* 241 Conn 412, and *Knight, supra,* 3 Cal 4th 320, n 7 (both adopting a "reckless or intentional" standard, but recognizing that some activities, such as golf, might warrant a different standard).

certain no-duty rules." Accordingly, the analysis of care owed to plaintiff in the professional sporting event by a coparticipant and by the proprietor of the facility in which it takes place must be evaluated by considering the risks plaintiff assumed when he elected to participate in the event and how those assumed risks qualified defendants' duty to him.

The risk assumed has been defined a number of ways but in its most basic sense it "means that the plaintiff, in advance, has given his . . . consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone. The situation is then the same as where the plaintiff consents to the infliction of what would otherwise be an intentional tort, except that the consent is to run the risk of unintended injury. . . . The result is that the defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence."

*        *        *

As a general rule, participants properly may be held to have consented, by their participation, to those injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation. [*Turcotte*, *supra*, 68 NY2d 437-439 (citations omitted).]

Finally, courts have almost universally recognized a policy rationale for an elevated standard of care. Courts have recognized that a fear of litigation could alter the nature of recreational activities and sports: "Fear of civil liability stemming from negligent acts occurring in an athletic event could curtail the proper fervor with which the game should be played and discourage individual participation . . . ." *Ross*, *supra*, 637 SW2d 14.

One might well conclude that something is terribly wrong with a society in which the most commonly-accepted

aspects of play—a traditional source of a community's conviviality and cohesion—spurs litigation. The heightened recklessness standard recognizes a commonsense distinction between excessively harmful conduct and the more routine rough-and-tumble of sports that should occur freely on the playing fields and should not be second-guessed in courtrooms. [*Crawn, supra,* 136 NJ 508.]

Courts have also recognized the potential flood of litigation that might result from the use of an ordinary negligence standard:

If simple negligence were adopted as the standard of care, every punter with whom contact is made, every midfielder high sticked, every basketball player fouled, every batter struck by a pitch, and every hockey player tripped would have the ingredients for a lawsuit if injury resulted. When the number of athletic events taking place . . . over the course of a year is considered, there exists the potential for a surfeit of lawsuits when it becomes known that simple negligence, based on an inadvertent violation of a contest rule, will suffice as a ground for recovery for an athletic injury. This should not be encouraged. [*Jaworski, supra,* 241 Conn 409-410.]

IV

ANALYSIS

We note that the Legislature has yet to modify the common law of torts regarding recreational activities, except in two narrow areas not at issue here.[7] Thus, the development of this area of the law, for now, is up to the courts. Const 1963, art 3, § 7; *Placek v Ster-*

---

[7] See the Roller Skating Safety Act, MCL 445.1721 *et seq.*; MSA 18.485(1) *et seq.,* and the Ski Area Safety Act, MCL 408.321 *et seq.*; MSA 18.483(1) *et seq.*

*ling Heights*, 405 Mich 638, 656-657; 275 NW2d 511 (1979).

### A. THE NATURE OF RECREATIONAL ACTIVITIES

In developing the common law in this area, we must recognize the everyday reality of participation in recreational activities. A person who engages in a recreational activity is temporarily adopting a set of rules that define that particular pastime or sport. In many instances, the person is also suspending the rules that normally govern everyday life. For example, it would be a breach of etiquette, and possibly the law, to battle with other shoppers for a particularly juicy orange in the grocery store, while it is quite within the rules of basketball to battle for a rebound. Some might find certain sports, such as boxing or football, too rough for their own tastes. However, our society recognizes that there are benefits to recreational activity, and we permit individuals to agree to rules and conduct that would otherwise be prohibited.

There are myriad ways to describe the legal effect of voluntarily participating in a recreational activity. The act of stepping onto the field of play may be described as "consent to the inherent risks of the activity," or a participant's knowledge of the rules of a game may be described as "notice" sufficient to discharge the other participants' duty of care.[8] Similarly, participants' mutual agreement to play a game may be

---

[8] See *Felgner, supra* at 36 ("If after such notice plaintiff . . . is injured, defendant is not liable, not because plaintiff assumed the risk of injury, but, rather, because defendant discharged his duty towards plaintiff by the giving of notice").

described as an "implied contract" between all the participants, or a voluntary participant could be described as "assuming the risks" inherent in the sport. No matter what terms are used, the basic premise is the same: When people engage in a recreational activity, they have voluntarily subjected themselves to certain risks inherent in that activity. When one of those risks results in injury, the participant has no ground for complaint. Justice Cardozo made this point quite eloquently in a case involving a young man injured on a ride at an amusement park:

> One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary, just as a fencer accepts the risk of a thrust by his antagonist or a spectator at a ball game the chance of contact with the ball. The antics of the clown are not the paces of the cloistered cleric. The rough and boisterous joke, the horseplay of the crowd, evokes its own guffaws, but they are not the pleasures of tranquillity. The plaintiff was not seeking a retreat for meditation. Visitors were tumbling about the belt to the merriment of onlookers when he made his choice to join them. He took the chance of a like fate, with whatever damage to his body might ensue from such a fall. The timorous may stay at home.

> \*        \*        \*

> Nothing happened to the plaintiff except what common experience tells us may happen at any time as the consequence of a sudden fall. Many a skater or a horseman can rehearse a tale of equal woe. . . . One might as well say that a skating rink should be abandoned because skaters sometimes fall. [*Murphy v Steeplechase Amusement Co*, 250 NY 479, 482-483; 166 NE 173 (1929) (citations omitted).]

Justice Cardozo's observations apply just as well to the conduct of coparticipants in a recreational activity as they do to the conduct of a person enjoying an

amusement park ride. Indeed, while most of the cited cases have addressed "contact" sports or team sports, Justice Cardozo's comments help illustrate that the same general analysis applies to noncontact and individual recreational activities. In all these activities, there are foreseeable, built-in risks of harm.

In *Hathaway, supra,* the Texas Court of Appeals faced a similar issue regarding the difference between contact sports and other activities when it addressed golfers' duties to each other. Before *Hathaway,* Texas had recognized a "reckless or intentional" standard of care for "competitive contact sports." *Connell v Payne,* 814 SW2d 486, 489 (Tex App, 1991). The *Hathaway* court extended this standard to golf, explaining:

> While the genteel game of golf can hardly be described as a "competitive contact sport," we believe the reckless and intentional standard is every bit as appropriate to conduct on the links as it is to conduct on the polo field.
>
> *     *     *
>
> Acts that would be negligent if performed on a city street or in a backyard are not negligent in the context of a game where a risk of inadvertent harm is built into the sport.
>
> As those persons who play golf well know, "shanking the ball is a foreseeable and not uncommon occurrence." "The same is true of hooking, slicing, pushing, or pulling a golf shot." Because of the great likelihood of these unintended and offline shots, it can indeed be said that the risk of being inadvertently hit by a ball struck by another competitor is built into the game of golf. . . . Many bad shots carry the ball to the right or the left of an intended line of play. Golfers playing to the right or left of that line will of course be endangered by such shots. "This risk all golf players must accept." [*Id.* at 616-617 (citations omitted).]

The risks on an ice rink are no less obvious than those on a golf course. One cannot ice skate without ice, and the very nature of ice—that it is both hard and slippery—builds some risk into skating. In addition, an "open skate" invites those of various ages and abilities onto the ice to learn, to practice, to exercise, or simply to enjoy skating. When one combines the nature of ice with the relative proximity of skaters of various abilities, a degree of risk is readily apparent: Some skaters will be unable to control their progress and will either bump into other skaters, or fall. All skaters thus take the chance that they will fall themselves, that they will be bumped by another skater, or that they will trip over a skater who has fallen.

### B. ADOPTION OF THE RECKLESS MISCONDUCT STANDARD

With these realities in mind, we join the majority of jurisdictions and adopt reckless misconduct as the minimum standard of care for coparticipants in recreational activities. We believe that this standard most accurately reflects the actual expectations of participants in recreational activities. As will be discussed in more detail below, we believe that participants in recreational activities do not expect to sue or be sued for mere carelessness. A recklessness standard also encourages vigorous participation in recreational activities, while still providing protection from egregious conduct. Finally, this standard lends itself to common-sense application by both judges and juries.[9]

---

[9] We recognize that we have stated this standard broadly as applying to all "recreational activities." However, the precise scope of this rule is best established by allowing it to emerge on a case-by-case basis, so that we might carefully consider the application of the recklessness standard in various factual contexts.

### C. APPLICATION OF THE LAW

Applying a recklessness standard in this case, we conclude that summary disposition was properly granted to defendant. Although plaintiff used the word "reckless" in her complaint, a review of the pleadings, depositions, and other documentary evidence reveals that plaintiff merely contends that defendant was skating backward without keeping a proper lookout behind her. These allegations amount to, at most, carelessness or ordinary negligence.[10] Thus, the trial court properly granted summary disposition for defendant.

### V

### RESPONSE TO THE CONCURRENCE

Whatever else we disagree upon, those in the concurrence do agree that defendant's conduct in this case is not actionable. The fundamental difference between the two opinions turns on the standard of care each believes should apply to this and cases of like kind. As stated above, we believe that a recklessness standard most nearly comports with the expectations of participants in recreational activities. While reasonable people can differ on this issue, in rejecting our standard, the concurrence purports to apply an ordinary negligence standard. In fact, it does not.

Among this Court's prime concerns must be the obligation to create common-law rules that create

---

[10] Indeed, plaintiff conceded that defendant's actions did not rise to the level of reckless misconduct. As the California Supreme Court has noted, conduct within the range of the ordinary activity involved in the sport can hardly be termed reckless. *Knight, supra,* 3 Cal 4th 319-321.

certainty and predictability in the law. We believe that the standard we adopt is consistent with our existing jurisprudence and lends itself to easy, common-sense application. On the other hand, the concurrence offers a bowdlerization of our traditional negligence standard that we believe would be exceedingly difficult to apply.

The instant case provides a prime illustration of our point: As noted in the statement of facts, defendant concedes that questions of fact exist regarding whether her conduct was negligent. Even without this admission, it seems readily apparent that questions of fact abound under a negligence standard. All agree that defendant was permitted to skate backward at an open skate, but, as the concurrence acknowledges, an ordinary negligence standard required defendant to maintain a lookout in order to avoid running into other skaters. Here, defendant says she kept a lookout, but admits that she still bumped into plaintiff and knocked her down. Under these circumstances, could not reasonable jurors conclude that defendant failed to maintain a *sufficient* lookout? Surely, the question whether defendant's conduct was sufficiently careful under an ordinary negligence standard presents a question of material fact. Yet the concurrence declares, as a matter of law, that defendant's conduct was not negligent. The concurrence can only reach that point by ignoring the appropriate standard of review pursuant to MCR 2.116(C)(10), which requires us to draw inferences in favor of plaintiff, and by ignoring defendant's admission that questions of fact exist regarding whether her conduct was negligent. We find it hard to reconcile the concurrence's position with the facts of this case and traditional negli-

gence law, and we are not persuaded that the concurrence's position corners the market on common sense.

Ignoring the foregoing problem, the concurrence attempts to support its hybrid negligence standard by suggesting that participants who conduct themselves within the rules of the game are not subject to liability under its proposed standard.[11] *Post* at 105-106. It is proposed that breaches of "formal or informal rules regarding safety" should be actionable, *id.* at 104, but apparently breaches of other rules should not. We think this endeavor to draw a distinction between "safety rules" (which apparently are inviolate) and non-safety rules (which apparently may be disregarded with legal impunity) attempts to draw a fruitless distinction that even participants themselves do not, and probably cannot, draw.[12] The concurrence's revised formulation of the conventional negligence standard would lead to profound doctrinal confusion, and more, rather than fewer, ancillary disputes.[13]

---

[11] Interestingly, the concurrence accuses us of implicitly overruling *Felgner, supra,* and reviving assumption of the risk because we recognize that participants consent to certain conduct that would otherwise be negligent. *Post* at 97-98. We find this odd, as the concurrence also recognizes that participants consent to conduct that might otherwise be negligent. The only difference we can discern is that the concurrence believes that such consent is strictly limited to conduct within the formal or informal rules regarding safety, *id.* at 104, while we believe that the consent is somewhat broader.

[12] What, for example, is an *informal* safety rule? Who makes such a rule, and how do we determine when it actually exists or when it is violated?

[13] The concurrence makes light of our concern over the effect of increased litigation on recreational activities. While it is difficult to quantify such an effect, we see clear evidence that litigation can exact a toll on what most would consider valuable social activities. See "Litigation League," by Creighton Hale, The Wall Street Journal, February 13, 1995 (briefly describing some of the effects of litigation on Little League base-

More to the point, what direction would the concurrence's standard give to our beleaguered trial judges who are required to referee such questions in the crucible of litigation? We think the answer is "precious little."

Let us consider real-world examples to test whether the concurrence has presented a workable standard. In the case of soccer, which is officially a "non-contact" sport, where would the concurrence draw the "negligence line" if a participant is injured when she is fouled? Is a minor foul actionable? Is a foul that draws a "yellow card" actionable? Or would the concurrence find the foul actionable if it results in a "red card"? Similarly, in hockey, is a player who receives a two-minute penalty for slashing liable for any injuries caused by his rule violation, or is he even liable for the type of foul that results in a major misconduct penalty? Presumably, the concurrence would not preclude liability where a referee missed a foul, but what about a case where the referee saw the activity and concluded that no rule violation was committed? May a jury look beyond that decision and overturn it?

---

ball); "The Price of Free Work is Rising, Nonprofits Find," by John Gallagher, The Detroit Free Press, December 4, 1997 (noting that Girl Scouts in metro Detroit must sell 36,000 boxes of cookies each year just to pay for liability insurance).

Our duty is to adopt rules that balance the need to ensure that victims of tortious injury have a remedy without creating a harbor for trivial suits, or destructive levels of litigation that will inhibit important social activity. While reasonable minds can differ regarding how best to strike that balance, we believe that the concurrence standard would provoke litigation on questions like "what are the informal safety rules in football?" and "must a plaintiff provide expert testimony in order to establish a breach of a safety rule?" As a matter of policy, we believe that the citizens of this state are better served by a standard that avoids proliferation and reduces the complexity of such litigation.

Surely all who participate in recreational activities
do so with the hope that they will not be injured by
the clumsiness or over-exuberant play of their copar-
ticipants. However, we suspect that reasonable par-
ticipants recognize that skill levels and play styles
vary, and that an occasional injury is a foreseeable
and natural part of being involved in recreational
activities, however the "informal and formal rules"
are structured and enforced.

Thus, we question whether participants in recrea-
tional activities make the kind of fine, Philadelphia
lawyer-like distinctions regarding rules and their vio-
lation that the concurrence would use as the touch-
stone of liability. We doubt it. When a player steps on
the field, she must recognize that an injury may
occur, but she does not know whether she will be
injured, or whether she will inadvertently injure
another player. We do not believe that a player
expects an injury, even if it results from a rule viola-
tion, to give rise to liability. Instead, we think it more
likely that players participate with the expectation
that no liability will arise unless a participant's
actions exceed the normal bounds of conduct associ-
ated with the activity.

Consequently, we believe that the line of liability
for recreational activities should be drawn at reck-
lessness. Recklessness is a term with a recognized
legal meaning and, more importantly, is a term sus-
ceptible of a common-sense understanding and appli-
cation by judges, attorneys, and jurors alike in the
myriad recreational activities that might become the
backdrop of litigation. Just as important, our standard
more nearly comports with the common-sense under-
standing that participants in these activities bring to

them. While the concurrence may disagree whether we have accurately assessed participant expectations, we think that our standard has the significant value of providing an explicit, easy to apply rule of jurisprudence. The concurrence has failed to present a sounder, clearer alternative standard.

VI

CONCLUSION

For the reasons set forth above, we conclude that coparticipants in a recreational activity owe each other a duty not to act recklessly. Because the trial court properly concluded that plaintiff could not show that defendant violated this standard, summary disposition was proper. Thus, we reverse the Court of Appeals decision and reinstate the grant of summary disposition for defendant.

WEAVER, C.J., and TAYLOR and CORRIGAN, JJ., concurred with YOUNG, J.

BRICKLEY, J. (concurring). As the majority notes, many state courts have addressed the question of the appropriate standard of care in sports injury cases. Ante at 81-83. Recently, most courts have held that, in order to state a cause of action, the plaintiff is required to allege that the defendant's actions were either reckless or intentional. Id.; 55 ALR5th 529, 537. Three jurisdictions, Nevada, Wisconsin, and Arizona, explicitly judge sports injury cases according to the "ordinary care" standard. Auckenthaler v Grundmeyer, 110 Nev 682; 877 P2d 1039 (1994); Lestina v West Bend Mut Ins Co, 176 Wis 901; 501 NW2d 28

(1993); *Estes v Tripson*, 188 Ariz 93; 932 P2d 1364 (Ariz App, 1997).

This Court has twice held that the proper standard of care for sports injury cases is ordinary care. *Felgner v Anderson*, 375 Mich 23, 32, 56; 133 NW2d 136 (1965); *Williams v Wood*, 260 Mich 322; 244 NW 490 (1932). More recently, after this Court abolished the "assumption of risk" doctrine in *Felgner, supra,* panels of the Michigan Court of Appeals have held both that ordinary negligence is the proper standard of care, *Schmidt v Youngs*, 215 Mich App 222; 544 NW2d 743 (1996); *Carey v Toles*, 7 Mich App 195; 151 NW2d 396 (1967), and that recklessness is the proper standard of care, *Higgins v Pfeiffer*, 215 Mich App 423; 546 NW2d 645 (1996); *Overall v Kadella,* 138 Mich App 351; 361 NW2d 352 (1984).[1]

The majority now holds that the Court of Appeals in *Higgins* and *Overall* got it right: A participant in a sporting event owes a coparticipant a duty not to act recklessly. *Ante* at 89. One of the reasons advanced by the majority is evident in the following passage:

> There are myriad ways to describe the legal effect of voluntarily participating in a recreational activity. The act of stepping onto the field of play may be described as "consent to the inherent risks of the activity," or a participant's knowledge of the rules of a game may be described as "notice" sufficient to discharge the other participants' duty of care. Similarly, participants' mutual agreement to play a game may be described as an "implied contract" between all the participants, or a voluntary participant could be described as "assuming the risks" inherent in the sport. No

---

[1] As the majority notes, the majority of the Court of Appeals panel in *Higgins* (and the panel in *Overall*) "seemed to ignore the fact that this Court had already articulated an 'ordinary care' standard in *Williams, supra.*" *Ante* at 80, n 4.

matter what terms are used, the basic premise is the same:
When people engage in a recreational activity, they have
voluntarily subjected themselves to certain risks inherent in
that activity. [*Id.* at 86-87.]

The majority offers further, more succinct, advan-
tages that it discerns in the recklessness standard:

> We believe that this standard most accurately reflects the
> actual expectations of participants in recreational activi-
> ties. . . . [W]e believe that participants in recreational
> activities do not expect to sue or be sued for mere careless-
> ness. A recklessness standard also encourages vigorous par-
> ticipation in recreational activities, while still providing pro-
> tection from egregious conduct. Finally, this standard lends
> itself to common-sense application by both judges and
> juries. [*Id.* at 89.]

None of the rationales advanced by the majority
withstands scrutiny. The first group of reasons,
quoted above, states in essence that the recklessness
standard is appropriate because participants in recre-
ational activities "assume the risk" of certain injuries.
Not only is this a novel use of the assumption of risk
doctrine (which was a complete bar to liability in
tort), but, more importantly, it overlooks the fact that
the assumption of risk doctrine was abrogated by this
Court in *Felgner*. Furthermore, common sense dic-
tates that none of the advantages of the recklessness
standard that the majority cites actually support its
conclusion.[2] I believe that the majority is wrong in

---

[2] For example, it is not at all apparent why the recklessness standard
"lends itself" more to "common-sense application by both judges and
juries" than does the ordinary negligence standard, which looks to
whether the defendant's conduct was reasonable under the circumstances.
See n 14; cf. *ante* at 89.

. overruling this aspect of our holdings in *Felgner* and
*Wood.*

I

I begin with the majority's assertion that the reck-
lessness standard "encourages vigorous participation
in recreational activities." *Ante* at 89; see *id.* at 82-83,
quoting *Ross v Clouser*, 637 SW2d 11, 14 (Mo, 1982);
*Crawn v Campo*, 136 NJ 494, 508; 643 A2d 600 (1994).
This observation echoes the reasoning of an earlier
case in this area: "the law should not place unreason-
able burdens on the free and vigorous participation in
sports by our youth," *Nabozny v Barnhill*, 31 Ill App
3d 212, 215; 334 NE2d 258 (1975).

The flaw in this reasoning, at least as applied to the
state of Michigan, is that this state has observed the
more exacting "ordinary care" standard in sporting
and recreational events at least since 1932, *Williams,*
*supra,* and, despite this higher standard of care, there
is no sign of any wane in the "vigorousness" of recre-
ational sports in Michigan.[3] Perhaps the majority

---

[3] For example, the state Department of Natural Resources estimates
that there are one million hunters and fur harvesters in Michigan, and as
many as two million anglers. Michigan Department of Natural Resources,
*Hunting and Fishing* (last modified June 30, 1999) <http://www.dnr.-
state.mi.us/Dept/HuntFish/huntfish.asp>. Travel Michigan reports "nearly a
million sailors, power boaters, and canoeists" on Michigan waters, Travel
Michigan, *Great Outdoors* (visited June 30, 1999) <http://www.michi-
gan.org/outdoors.htm>, as well as the fact that Michigan "builds and
opens more [golf] courses than any other state." Travel Michigan, *Golf in*
*Michigan* (visited June 30, 1999) <http://www.michigan.org.golf.htm>.

Furthermore, the fact that Michigan has observed the "ordinary care"
standard in this area at least since 1932, *Williams, supra,* calls into doubt
any concern that, " '[w]hen the number of athletic events taking
place . . . over the course of a year is considered, there exists the poten-
tial for a surfeit of lawsuits when it becomes known that simple negli-
gence, based on an inadvertent violation of a contest rule, will suffice as a

would like to see even greater vigorousness in these activities, and plainly believes that the recklessness standard would serve this end. But, without any empirical evidence that participation or vigorousness in the state's recreational sports and activities would reach even greater heights under the recklessness standard, this Court should not attempt any social engineering in this area by altering long-existing rules of tort law.

The majority assumes that its decisions regarding tort standards of care are relevant considerations for those deciding whether to participate in recreational activities. I have my doubts regarding this proposition.[4] But, even if we accept it as true, the majority's conclusion does not necessarily follow. Indeed, if participants in recreational activities have the legal foresight with which the majority credits them, it is just

---

ground for recovery for an athletic injury.'" *Ante* at 85, quoting *Jaworski v Kiernan*, 241 Conn 399, 409-410; 696 A2d 332 (1997). Given that ordinary negligence has been the rule in Michigan for at least sixty-seven years, and there has not yet been any cry raised over "a surfeit" of sports injury cases, either Michiganders are exceptionally slow in discovering that "simple negligence . . . will suffice as a ground for recovery" in this area, or Michiganders are not nearly as litigious as some might fear. Regardless, we should not alter the ordinary negligence standard of care to stem excessive lawsuits in this area until it appears that such lawsuits are actually a possibility.

[4] In overturning the doctrine of charitable immunity, for example, this Court noted the observations of a federal court addressing the same issue:

"No statistical evidence has been presented to show that the mortality or crippling of charities has been greater in States which impose full or partial liability than where complete or substantially full immunity is given. Nor is there evidence that deterrence of donation has been greater in the former. Charities seem to survive and increase in both, with little apparent heed to whether they are liable for torts . . . ." [*Parker v Port Huron Hosp*, 361 Mich 1, 17; 105 NW2d 1 (1960), quoting *President & Directors of Georgetown College v Hughes*, 76 US App DC 123, 136; 130 F2d 810 (1942).]

as likely that many would choose not to participate in these activities because the recklessness standard might encourage dangerous behavior or make it too difficult for participants to recover in the event they are injured. This heightened possibility of injury and unavailability of recovery would discourage vigorous participation, or any participation at all, by those who are less bold, or who might not want to take the financial risks presented by the possibility of injury.

These questions warn us that such policy issues are difficult for courts.[5] Should we require that the parties submit statistical analyses of the increased or decreased participation in recreational sports in those jurisdictions that have adopted the negligence and recklessness standards? Should we commission a study on the comparative vigorousness of play in these jurisdictions? Should we compare the per capita incidence of sports injury litigation in different jurisdictions? In the absence of reliable evidence that the negligence standard actually has an effect on the participation in or the vigorousness of recreational activities, this Court should not overrule its precedent on the basis of such a policy judgment, particularly in light of this state's longstanding policy that, "[w]here there is a person negligently injured by another, normally there is recovery therefor." *Williams v Polgar*, 391 Mich 6, 11; 215 NW2d 149 (1974); see *Parker v*

---

[5] Further warning us is the fact that the Legislature, which has far greater access to the proper studies and statistics, has reinstated the assumption of risk doctrine with respect to sports accidents at roller rinks and ski resorts. MCL 408.342; MSA 18.483(22) (Ski Area Safety Act); MCL 445.1725; MSA 18.485(5) (Roller Skating Safety Act). The Legislature has not, however, reinstated assumption of risk in all sporting activities. This Court should not seek to fill the Legislature's policy-making role without compelling reasons and sound explanations.

*Port Huron Hosp*, 361 Mich 1, 11; 105 NW2d 1 (1960)
("[N]ot only at the common law but also at the pres-
ent time the general rule has been that one is liable
for his negligence or tortious acts").[6]

II

In *Felgner*, we stated that "[a]ssumption of risk
should not again be used in this State as a substitute
for, or as a supplement to, or as a corollary of, con-
tributory negligence . . . . The traditional concepts
of contributory negligence are more than ample to
present that affirmative defense to established negli-
gent acts." *Id.* at 56. Later, we noted that "the doc-
trine of contributory negligence has caused substan-
tial injustice since it was first invoked in England in

---

[6] Another relevant consideration is this Court's abolition of charitable
tort immunity and interfamily tort immunity, though both these rules are
supported by more compelling policy rationales than encouraging the vig-
orousness of sports. In *Parker, supra*, we noted that Michigan courts have
prohibited tort suits against charities since 1894, relying upon "public pol-
icy that benevolence should not be impaired by recovery of damages for
torts of the employees of the charitable trust." *Id.*, p 13. The *Parker* Court
held that this policy could not justify " 'the injured individual's having to
bear the loss wrongfully inflicted upon him . . . .' " *Id.*, p 19, quoting
*President & Directors of Georgetown College v Hughes*, n 4 *supra*, p 137.

We also overturned the rule that members of a family may not sue one
another in tort. *Plumley v Klein*, 388 Mich 1; 199 NW2d 169 (1972). This
rule was based on " 'the interest of the peace of the family and of society,
and [was] supported by sound public policy.' " *Id.*, p 5, quoting *Elias v
Collins*, 237 Mich 175, 177; 211 NW 88 (1926). Such policy gave way, how-
ever, to the greater concern that those who are injured by negligent con-
duct be allowed to recover. *Id.*

In light of the abrogation of these rules, based upon the public policy of
encouraging charitable giving and "the peace of the family and of society,"
it seems strange to base partial tort immunity in sports injury suits on a
desire to encourage vigorous recreational activities. Even if we accept as
true that a recklessness standard would encourage vigorous participation
in sports (again, a doubtful proposition), we must take note of this Court's
treatment of tort immunities based upon far more compelling rationales
than this one.

1809," and replaced it with comparative negligence. *Placek v Sterling Heights*, 405 Mich 638, 652; 275 NW2d 511 (1979).[7] Thus, juries are responsible for deciding the degree to which a plaintiff's negligence (including the assumption of the risk), contributed to an injury, and reducing the damage award accordingly.

The majority recognizes our abrogation of the doctrine of assumption of risk in *Felgner. Ante* at 78. More important, the majority properly notes that assumption of risk includes the doctrine of *volenti non fit injuria*, and that in light of *Felgner*, "[i]t is questionable whether this maxim retains any meaning in this state . . . ."[8] *Id.* at 79, n 3. Regardless, the majority depends upon the notion of *volenti non fit injuria* to grant partial immunity to the defendant in this case: "When people engage in a recreational activity, they have voluntarily subjected themselves to certain risks inherent in that activity. When one of those risks results in injury, the participant has no ground for complaint." *Id.* at 87. The majority's statement is simply a paraphrasing of the maxim: " '[T]o a willing person a wrong is not done.' " *Id.* at 79, n 3.[9]

---

[7] The Legislature has recently partially affirmed and partially overturned *Placek*, replacing "pure" comparative negligence with "hybrid" comparative negligence. MCL 600.2958, 600.2959; MSA 27A.2958, 27A.2959. Under this scheme, a plaintiff's recovery is limited to economic damages if the degree of fault in causing the injury was greater than the aggregate fault of all others causing the injury. *Id.*

[8] A leading treatise on torts states that some courts "have been compelled to invent other names for [assumption of risk], such as 'incurred risk,' or 'volenti non fit injuria.' This appears to be largely a distinction without a difference; and most courts have made general use of the one term." Prosser & Keeton, Torts (5th ed), § 68, p 480.

[9] The majority quotes at length from Chief Judge Cardozo's oft-cited opinion in *Murphy v Steeplechase Amusement Co*, 250 NY 479, 482-483; 166 NE 173 (1929). *Ante* at 87. But this opinion is based upon the doc-

Certainly, there is a sense in which assumption of risk has been recognized as surviving the adoption of contributory negligence schemes. This has been described as "primary assumption of risk," or the "duty perspective" on assumption of risk. Prosser & Keeton, Torts (5th ed), § 68, pp 480-481.

> [W]here the plaintiff voluntarily enters into some relation with the defendant, with knowledge that the defendant will not protect him against one or more future risks that may arise from the relation . . . [h]e may then be regarded as tacitly or *impliedly* consenting to the negligence, and agreeing to take his own chances. [*Id.* at 481.]

This is presumably the sense of "assumption of risk" that the majority means to invoke when it discusses " 'consent to the inherent risks of the activity,' "[10] " 'notice' sufficient to discharge the other participants' duty of care,"[11] or the " 'implied contract' between all

---

trine of assumption of risk, which, as the majority recognizes, has been abolished in Michigan. *Felgner, supra.* Indeed, immediately preceding the section quoted by the majority is the phrase *"volenti non fit injuria,"* *Murphy, supra* at 482, which, as already noted, the majority sees as probably not "retain[ing] any meaning" after *Felgner. Ante* at 79, n 3.

[10] Restatement Torts, 2d, § 50, comment b, p 86, is frequently cited as authority for the proposition that consent is an appropriate basis for heightening the standard of care in sports injury cases. See *ante* at 79. But consent, in this sense, is a privilege only to *intentional* invasions of person or property. See Restatement Torts, 2d, § 50, p 85 ("The rule stated in § 892[2] as to apparent consent to the invasion of an interest applies to the *intentional invasion* of interests of personality" [emphasis supplied]); 4 Restatement Torts, 2d, § 892A(1), p 364 ("One who consents to conduct of another *intended to invade* his interests cannot recover" [emphasis supplied]); Prosser & Keeton, *supra,* § 18, p 112 ("The problem discussed here is the meaning and effect of consent in relation to *intentional interferences* with person or property" [emphasis supplied]).

[11] The majority's quotation of *Felgner* at this point, *ante* at 86, n 8, is the *Felgner* Court's paraphrasing of the holding of an earlier English case that refused to impose liability for injuries inflicted by a spring gun that the plaintiff knew was on the premises. *Id.* at 36, citing *Ilott v Wilkes,* 3 B & Ald 304; 106 Eng Rep 674 (KB 1820). The *Felgner* Court did not rely on

the participants." *Ante* at 86-87; see *id.* at 82, quoting *Turcotte v Fell*, 68 NY2d 432, 437-439; 510 NYS2d 49; 502 NE2d 964 (1986).

This doctrine does not, however, support the majority's result in this case.[12] The plaintiff did not consent to *any* conduct of the defendant or the other participants in the free skate. The plaintiff's implied consent in entering into this recreational activity is based upon the relationship that she entered into with her coparticipants. Prosser & Keeton, *supra*, pp 480-481. Since most recreational activities and sporting events have formal or informal rules regarding safety,[13] we must assume that the plaintiff entered into this relationship with her coparticipants with

---

or approve this case, however. Indeed, it observed that the case had not been cited by earlier Michigan cases, and "assume[d] either that the Justices [in earlier decisions] did not approve of its principles or they thought it not pertinent." *Id.* at 39. Despite this treatment by the *Felgner* Court, *Ilott* might be an early example of "primary" assumption of risk.

[12] Our analysis of "consent" is hampered by the fact that this word has been used to describe a number of different legal concepts. For example, consent is a defense to an action alleging an intentional tort, but such consent cannot be a defense to a tort sounding in negligence. See n 10. Indeed, the nearest thing to "consenting" to negligence is the doctrine of assumption of the risk, which was abrogated in *Felgner* as a defense in negligence actions.

The "consent" that I refer to is the only variety of consent that is viable under the facts of the instant case, and that is "primary assumption of risk," as discussed above. Prosser & Keeton, *supra* at 481. The effect of primary assumption of the risk is to relieve the defendant of a legal duty to protect the plaintiff from the consented-to conduct; here, conduct that is within the safety rules of the particular sport. *Id.* at 496 ("[A]ssumption of risk in this form is really a principle of no duty, or no negligence, and so denies the existence of any underlying cause of action").

[13] A formal safety rule would be a safety rule that is written into the rule books of a particular sport or activity, while an informal safety rule would be one that is widely recognized by participants in the absence of a formal rule. The parties in the instant case agree that the relevant safety rule of free skating is that a skater looks behind her when skating backward. This would presumably be an "informal" rule, as no rule book has been presented by the parties.

knowledge of these rules, and the expectation that they would be obeyed. We cannot assume most participants in such activities consent to others' behavior that is either accidentally or purposefully outside those safety rules.

Indeed, it would likely be a great surprise to the millions of participants in Michigan's recreational sports and activities that, by participating, they were legally consenting to their coparticipants' breach of the safety rules of those activities. One must wonder about the effect on the "vigorousness" of these sports, if it became common knowledge that this Court sanctioned breaches of these activities' safety rules, as long as the breaches did not amount to recklessness.

The fact that such rules exist supplies a ready definition of the legal duties that participants in sporting activities must observe: Participants have a tort-enforceable duty to one another to obey the safety rules of the sport or activity. If a participant engages in conduct outside these rules, that participant has potentially breached her legal duty to her coparticipants, and the factfinder must determine whether her conduct was reasonable under the circumstances. Participants in a sporting or recreational activity consent to actions by their coparticipants that would not satisfy the strictures of "ordinary care" in everyday activity, but they do not consent to behavior unconstrained by the safety rules of the particular activity.

---

A "safety" rule, as opposed to a non-safety rule, is a rule that increases the safety of the sport or activity, rather than merely increasing the fairness or competitiveness of the activity. The parties to the instant case have agreed that the relevant safety rule of free skating is that a backward-skating participant should look behind her while skating backward; there is no basis for questioning whether this is a safety rule or not.

By participating in the open skate, the plaintiff in the instant case impliedly consented to the defendant's backward skating, knowing that this was likely to be more dangerous than behavior that the plaintiff would encounter, for example, on a walk in her neighborhood. Cf. *ante* at 86-87. The parties agree, however, that one of the safety rules of free skating is that, while skating backward, the skater should periodically look behind her to see if she is going to run into anyone. Thus, the plaintiff consented to the heightened risk of the defendant's behavior with the knowledge that the defendant would lessen that risk by periodically looking behind her as she was skating backward.

If the defendant was skating backward and obeying the safety rules by looking behind her, and then collided with the plaintiff, she cannot be held liable because she had no duty to behave more cautiously. Prosser & Keeton, *supra* at 481. If, however, the defendant ran into the plaintiff while she was skating backward and *not* periodically looking behind her, then she engaged in conduct that the plaintiff had not consented to, and can be held to have breached her duty toward the plaintiff if she did not act with reasonable care.[14] *Id.*

---

[14] It might be argued that this conduct would be reckless behavior under the circumstances. But there is far more room for disagreement about whether this behavior is "reckless" or "negligent," than there is for disagreement about whether this behavior is outside the agreed-upon safety rules of the activity. Where the parties agree upon the applicable safety rule of a sport, or where the rule is written into a rule book, this determination will be particularly straightforward. Where the parties disagree about the relevant safety rule, and reasonable minds could differ, a factual determination will be necessary. MCR 2.116(C)(10). Such a determination is certainly not beyond the capabilities of trial courts and juries in Michigan.

Because there is no basis in fact or law for holding that participants impliedly consent to any behavior that is more dangerous than that allowed by the activity's safety rules, primary assumption of risk is not a basis for holding that coparticipants in sporting activities have only the duty to refrain from acting recklessly. *Id.* This Court should not dash participants' expectations by insisting, without reason, that their participation indicates their consent to more dangerous conduct.

III

Despite my disagreement with the majority's reasoning, I reach its result because the plaintiff in this case submitted no evidence that the defendant breached any safety rules during free skating. The plaintiff has urged that the relevant rule of free skating is that "the skater has the responsibility for looking behind her when skating backward and should not rely upon others." The only evidence in the record regarding whether the defendant did look behind her while skating backward, is the defendant's deposition testimony:

> *Q.* Now, when you skate backward are you able or do you attempt to look where you're going by turning your head from one side to the other?

---

If the factfinder determines that the defendant's conduct was within these rules, the case ends because the defendant had no legal duty to the plaintiff. If the trial judge or jury finds that the defendant's conduct was outside the rules, an actionable duty exists. The trial would then continue to determine whether the defendant breached this duty by failing to use reasonable care under the circumstances. Thus, in contrast to the majority, I believe that the "ordinary care" standard that I propose is at least as susceptible to "common-sense application by both judges and juries" as is the recklessness standard. Cf. *ante* at 89.

*A.* Yes.

*Q.* Do you feel that when you're skating backward you can see everything behind you or is there some limitation in that?

*A.* Well, *I would look* and then the people that were facing me, like I was skating backwards this way and you would be facing me, you would say there's people behind me.

*Q.* So you were depending *somewhat* on the person that was skating forward to let you know if someone was behind you?

*A.* Yeah, *I would check and they told me.* [Emphasis supplied.]

While it is clear that the defendant partially relied on those skating with her to warn her about other skaters, she also unambiguously stated that she "looked" or "checked" behind her. Thus, there is no basis on which to say that she violated any safety rules of the free skate, and no basis for finding that she violated any duty that she owed to the plaintiff.[15] MCR 2.116(C)(10). The trial court properly granted her motion for summary disposition, and, like the majority, I would reverse the judgment of the Court of Appeals.

CAVANAGH and KELLY, JJ., concurred with BRICKLEY, J.

---

[15] It is immaterial, for these purposes, that the defendant stipulated that questions of fact remain regarding whether she was negligent. As the above discussion makes clear, the plaintiff has not presented facts sufficient to maintain that the defendant owed her a tort-enforceable duty, and therefore summary judgment is appropriate.