INDIANA INSURANCE COMPANY v AUTO-OWNERS
INSURANCE COMPANY

Docket No. 241171. Submitted October 8, 2003, at Grand Rapids. Decided
February 19, 2004, at 9:10 A.M. Leave to appeal denied, 470 Mich
____.

Indiana Insurance Company, the liability insurer for a public school
district under a policy that excluded coverage for bodily injury aris-
ing out of the use of an automobile, brought an action in the
Kalamazoo Circuit Court against Auto-Owners Insurance Company,
the automobile insurer for the school district, seeking a declaratory
judgment that the defendant must reimburse the plaintiff for the
costs of defending and settling an action brought against the school
district. The school district and several of its employees had been
sued for gross negligence after two elementary school girls were
abducted from a school bus and assaulted by men who falsely
claimed to be the girls' father or babysitters and instructed that the
girls be dropped off at a location other than their normal bus stop
on their way home from school. The request for a different drop-off
location was not handled according to the school district's estab-
lished policy. On cross-motions for summary disposition, the court,
Philip D. Schaefer, J., granted the plaintiff's motion and issued a
judgment that included the parties' stipulation that the defendant
would reimburse the plaintiff for half of the insured's costs if the
judgment is upheld on appeal. The defendant appealed.

The Court of Appeals held:

The defendant's automobile insurance policy, among other
things, provided coverage for bodily injury arising out of the use of
the insured's automobile and defined "school bus" to mean use of
the insured's automobile to transport students to and from school,
including any operations necessary and incidental to such transpor-
tation. Delivering students safely to a particular location is a use of
the school bus within the meaning of the policy. In this case, the
school bus driver negligently used the bus, and the injuries sus-
tained by the girls were foreseeably identifiable with such use,
inasmuch as the driver allowed two unidentified men onto the bus
to take the girls over their objections and did not contact the
school, ask the men for identification, or ask the girls anything
after they objected.

Affirmed.

INSURANCE — AUTOMOBILES — SCHOOL BUSES.

> Use of a school bus, as contemplated in an automobile liability policy insuring against bodily injury or property damage arising out of the use of the school bus to transport students to and from school and including any operations necessary and incidental to such transportation, is not limited to the carrying of the students on the bus and includes ensuring that each transported student reaches the predetermined bus stop under the supervision of the school bus driver; an injury that is foreseeably identifiable with disembarkation at a place other than the predetermined location is an injury that arises out of the use of the school bus.

*Kluczynski, Girtz & Vogelzang* (by *Mark T. Ostrowski*) for the plaintiff.

*Willingham & Coté, P.C.* (by *John A. Yeager* and *Curtis R. Hadley*), for the defendant.

Before: GRIFFIN, P.J., and NEFF and MURRAY, JJ.

MURRAY, J. In this declaratory judgment action, defendant Auto-Owners Insurance Company appeals as of right from the circuit court's order granting plaintiff Indiana Insurance Company's motion for summary disposition pursuant to MCR 2.116(C)(10). We affirm.

The main issue in this appeal is whether Auto-Owners is contractually responsible for half of the settlement and legal costs paid on behalf of plaintiff and defendant's insured for injuries sustained by two students kidnapped while being discharged from the insured's school bus.[1] We conclude that Auto-Owners, the insured's automobile liability carrier, is responsible for these costs.

---

[1] We note that there is no dispute that all the insured's costs resulting from the underlying litigation will be covered by these insurance carriers. The parties stipulated in the final judgment that if the trial court's ruling was upheld on appeal, Auto-Owners would reimburse Indiana for half the costs (plus taxable costs and interest).

I. MATERIAL FACTS AND PROCEEDINGS

· The facts from the underlying suit that are material to this case are undisputed. They are also tragic. Two elementary school-aged girls, ages nine and six, respectively, attended school in a Michigan school district. The school district had two bus routes for its students, one for the gray bus and the other for the red bus. The girls were assigned to the gray bus route.

On March 21, 1997, three male adults, named Ron, Lee, and Ricky, who several weeks earlier decided to abduct the girls, drove to the school district's bus garage where one of them gave a note to Lewis, who was the director of transportation for the school district and the driver of the gray bus on that day. The note requested that the girls be transferred to the red bus so that they could be dropped off at their babysitter's house.[2] Without any contact with the school office, Lewis took the girls to the red bus and instructed Earl, the red bus driver, to drop the girls off with a babysitter at the location stated in the note. However, when the girls refused to get out of the bus at that location because it was not their normal bus stop, Earl decided to return with the girls to the bus garage. After the girls were not dropped off as requested in the note, one of the kidnappers called the bus garage and, falsely claiming to be the girls' parent, wanted to know why the girls had not been

---

[2] According to Lewis's deposition testimony, the school district policy was that all requests for students to change buses were to be in writing, signed by a parent, and submitted to the principal's office. The note in this case was submitted directly to Lewis, who took it at "face value." The only discrepancy in the note was that there were two n's rather than one in the purported signature of the girls' father.

dropped off as requested in the note, and asked that the girls be dropped off at the next bus stop, a trailer park. This oral request for a second drop off location was conveyed by the school transportation department to Earl.[3] The three men met the bus at the trailer park. According to Earl, the first man (whom she did not know) stepped onto the first step of the bus, while the second man (whom she recognized but did not know) came onto the second step of the bus. After the two men were let on the bus by Earl, the girls (now crying)[4] were taken by their arms by Ron and escorted off the bus.[5] As one of the girls more directly characterized the situation while testifying at the criminal trial of Lee, Ron "dragged me and my sister off the bus." Several days after the abduction, the three men were apprehended in Florida with the girls.

As a result of the events described above, the three men were convicted of multiple felonies in the United States District Court for the Western District of Michigan. Ricky pleaded guilty to one count of conspiracy to kidnap and two counts of kidnapping, while Ron pleaded guilty to conspiracy to kidnap, two counts of kidnapping, two counts of transporting by motor vehicle a minor in interstate commerce with the intent that such individual engage in criminal sexual activ-

---

[3] There was never any signed note requesting that the girls be dropped off at the trailer park.

[4] Indiana asserts that the girls informed Earl that the man (Ron) taking them off the bus was a "pervert." Earl's testimony is not as clear as Indiana suggests, as Earl answered affirmatively to a compound question:

Q: Okay. Apparently the girls objected and they were crying and they said he is a pervert, he is a pervert.

A. Yes.

[5] According to Earl, the girls objected to leaving the bus with the first man who appeared on the bus, but not with the second man, who Earl recognized as a frequent babysitter for other children on her bus route.

ity, and two counts of crossing a state line with intent to engage in a sexual act with a person under the age of twelve years. Lee was convicted by a jury of conspiracy to kidnap and two counts of kidnapping.

A civil action was filed in state court by the conservator of the girls' estates. In that suit it was alleged that Earl, Lewis, and other employees of the school district were grossly negligent in that they acted with willful and wanton disregard for the safety of the girls in the "operation" of a motor vehicle. Specifically, it was alleged that Earl drove the children to an ultimate destination that was not assigned or approved by the board of education and the administrative office, and allowed the kidnappers to enter the bus and remove the girls into their custody. Indiana provided a defense in the underlying action and settled the claims.

Thereafter, Indiana, which had issued a general commercial policy to the school district,[6] filed the

---

[6] The policy issued to the school district by Indiana includes the following pertinent language:

*1. Insuring Agreement*

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .

*2. Exclusions*

This insurance does not apply to:

\*      \*      \*

*g. Aircraft, Auto or Watercraft*

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

instant complaint for declaratory judgment. Indiana asserted that, pursuant to Auto-Owners policy of no-fault automobile insurance,[7] Auto-Owners promised to defend and indemnify the school district in regard to claims for bodily injury arising out of the ownership, maintenance, or use, including the loading and unloading, of its school buses. Indiana alleged that the allegations in the amended complaint in the underlying action fell within the coverage provided to the school district by Auto-Owners. Indiana further asserted that the general commercial liability policy that it issued to the school district specifically excluded liability for bodily injury arising out of the

---

[7] The policy issued to the school district by Auto-Owners includes the following language:

*1. Coverage*
*a. Liability Coverage—Bodily Injury and Property Damage*
*We* will pay damages for *bodily injury* and *property damage* for which *you* become legally responsible because of or arising out of the ownership, maintenance or use of *your automobile* as an *automobile* . . . . [Emphasis in original.]

The policy also contained a "School or Church Bus Use" endorsement, which includes the following language:

*1. DEFINITIONS*
The following definitions apply in additional [sic] to those contained in *SECTION 1—DEFINITIONS* of the policy.

a. *School bus* means use of *your automobile* to transport school students and teachers:

(1) to and from school; and
(2) to and from school sponsored games and activities;

including incidental transportation of school officials, board members, doctors, nurses, parents or guardians of school students and guests in connection with school activities.

\*   \*   \*

School and church bus use include any operations necessary and incidental to such use and the care and maintenance of your automobile. [Emphasis added.]

ownership, maintenance, use, or entrustment to others of any automobile.

Auto-Owners moved for summary disposition pursuant to MCR 2.116(C)(7) and (C)(10), arguing that Indiana's basis for its declaratory action contradicted the prior opinion and order entered in the underlying case. Auto-Owners argued that the circuit court had already held that the provisions of the no-fault act were not applicable because there was no motor vehicle accident, and that this ruling was a prior judgment entitling it to summary disposition pursuant to MCR 2.116(C)(7).

Auto-Owners subsequently filed a supplemental motion for summary disposition. In that supplemental motion, Auto-Owners argued that despite Indiana's characterization of the allegations, it was clear that the direct causes of the injuries to the girls were the felonious kidnapping and the subsequent assault by the kidnappers. Citing *Thornton v Allstate Ins Co*, 425 Mich 643; 391 NW2d 320 (1986); *Wakefield Leasing Corp v Transamerica Ins Co*, 213 Mich App 123; 539 NW2d 542 (1995); and *Kangas v Aetna Casualty & Surety Co*, 64 Mich App 1; 235 NW2d 42 (1975), Auto-Owners asserted that injuries from criminal acts are not covered by no-fault insurance because they do not meet the requirement of being "foreseeably identifiable with the normal use, maintenance and ownership of the vehicle."

Indiana filed a response to these motions and also moved for summary disposition pursuant to MCR 2.116(C)(10). Indiana argued that the Auto-Owners policy provided coverage that was broader than that required by the no-fault act and clearly encompassed the claims made in the underlying action. Indiana further argued that the policy provided coverage for

bodily injury that arose out of the "use" of the school bus, which was defined to include transportation of students to and from school and any operations necessary and incidental to such use. Indiana argued that "[c]learly the injuries alleged arose out of the transportation of the . . . girls and the operations which were necessary and incidental to such use," relying in large part on *Pacific Employers Ins Co v Michigan Mut Ins Co*, 452 Mich 218; 549 NW2d 872 (1996).

On March 4, 2002, a hearing was held on the parties' motions for summary disposition. Counsel for Auto-Owners stated that he thought the issue really came down to whether this type of criminal act was "foreseeably identifiable" with the normal use of a motor vehicle, arguing that the kidnapping could have easily happened on or off school grounds. The trial court held:

> This is a close call, and I acknowledge that—And I believe that I'm right. There are no material facts at issue. Everybody agrees on, essentially, what happened—at least with regard to the purposes of this motion.
>
> I believe after having studied these cases—And I have studied them and revisited them—that *Pacific Insurance* is—is the case that is most persuasive because it is a school bus case. It speaks directly to disembarking children at a predetermined and approved location, and it's the—it is the most recent pronouncement. In other words, *Wakefield, Thornton,* and *Kangus* (phonetic) were all decided before *Pacific Insurance* was decided. And I think the Supreme Court in *Pacific Insurance* took great pains to emphasize that incidental use of a—of a school bus includes the discharging of students at a proper location.
>
> Quite frankly, this is a case where there are several alleged acts of negligence or intentional torts. The Court could conceive of a theory where the school district would be liable—if only on a case of employee behavior or misbehavior or employee negligence; where the bus drivers are

liable because of their own acts of negligence; where [Ron, Lee, and Ricky] are liable because of their criminal acts; and that there were several causes of the injuries complained of. In other words, Indiana might be liable generally because of school district shortcomings where Auto Owners could be liable because of the operation of the bus.

I think when—under the facts presented here where the school bus drivers engaged in behavior that, by its very nature, had to raise flags. This isn't a case of a school bus, you know, stopping at a—at a red light and someone just happen to bust in on the bus. Here the school bus was used as a—as a vehicle—unwittingly, of course, to further the acts—the criminal acts—of [Ron, Lee, and Ricky].

And there was this driving around on separate buses and, you know, stopping and letting the—you know, letting the people on—letting [Ron] and so forth on. That is not an inci—I mean that's—that's—that's not mere incidental. That's not merely contributing to the cause of the injuries. It is, in fact, producing the injury. And, accordingly, I think that the only appropriate way to go is for summary disposition to be granted in favor of Indiana and denied as—as to Auto Owners. And, accordingly, an order to that effect may enter.

The trial court also concluded that it was satisfied that there was no res judicata preclusion because the same parties and their privies were not involved in both actions. Judgment was entered in favor of Indiana and against Auto-Owners.

## II. ANALYSIS

In *Old Kent Bank v Kal Kustom Enterprises*, 255 Mich App 524, 528-529; 660 NW2d 384 (2003), we recently set forth the standard for reviewing the propriety of a decision made pursuant to MCR 2.116(C)(10):

A trial court's decision regarding a motion for summary disposition is reviewed de novo. *Singerman v Muni Service Bureau, Inc*, 455 Mich 135, 139; 565 NW2d 383 (1997). Summary disposition may be granted pursuant to MCR 2.116(C)(10) when, except with regard to the amount of damages, there is no genuine issue about any material fact. When deciding a motion for summary disposition pursuant to MCR 2.116(C)(10), a court must consider all pleadings, affidavits, depositions, and other documentary evidence in the light most favorable to the nonmoving party. *Ritchie-Gamester v Berkley*, 461 Mich 73, 76; 597 NW2d 517 (1999). The nonmoving party has the burden of rebutting the motion by showing, through evidentiary materials, that a genuine issue of disputed fact does exist. *Smith v Globe Life Ins Co*, 460 Mich 446, 455; 597 NW2d 28 (1999).

The dispositive issue in this appeal is whether a no-fault insurer or a general liability carrier is responsible for insuring injuries resulting from a criminal act that happens to involve a school bus. The trial court held that *Pacific Employers* was the most analogous Supreme Court precedent because it involved injuries suffered by a student after alighting from a school bus. We agree with the trial court that this a close case because of the difficulty in determining which of two competing legal theories controls and, also like the trial court, we conclude that *Pacific Employers* controls this case.[8]

---

[8] Auto-Owners incorrectly argues that the trial court's denial of the school district's motion for summary disposition in the underlying case had a res judicata effect in the instant case. "To be accorded the conclusive effect of res judicata, 'the judgment must ordinarily be a firm and stable one, the "last word" of the rendering court . . . .'" *Kosiel v Arrow Liquors Corp*, 446 Mich 374, 381; 521 NW2d 531 (1994) (citation omitted). See also *Ditmore v Michalik*, 244 Mich App 569, 576; 625 NW2d 462 (2001). Because the denial of a motion for summary disposition was, at the time the motion was decided, interlocutory in nature, res judicata does not apply. *Goodrich v Moore*, 8 Mich App 725, 727-728; 155 NW2d 247 (1967). But see MCR 7.202(7)(a)(v) (defining a final order as an order

In *Pacific Employers*, a five-year old kindergarten student was dropped off at the wrong bus stop after her first day of school. This occurred despite a list being provided to the driver indicating the drop-off locations for all students and a tag worn by the student indicating her proper drop-off point. Additionally, if there was a discrepancy between the tag and the list, the driver was to call the school. *Pacific Employers*, *supra* at 221. After alighting from the bus and walking approximately half a mile, the student was struck by an oncoming car. *Id.*

The school district had three insurers: Michigan Mutual, the general liability carrier; State Farm, the automobile liability carrier; and Pacific Employers, the umbrella carrier. *Id.* at 221-222. Pacific Employers filed an action seeking a declaratory judgment that the general liability carrier (Michigan Mutual), as opposed to the automobile insurer (State Farm), was the primary insurer. *Id.* at 222. The circuit court so ruled, holding the general carrier liable for the costs incurred in settling the underlying suit. *Id.* at 223. This Court affirmed, holding that the "use" of the school bus encompassed ' "only those injuries arising from the carrying of persons aboard the bus.' " *Id.*, quoting 204 Mich App 265, 269; 514 NW2d 239 (1994). Since the student's injuries occurred well after she alighted from the school bus, we concluded the auto insurer was not liable under the policy. *Id.*

The Supreme Court reversed. In doing so, the Court focused on whether the student's injury "arose from" the "use" of the school bus, *id.* at 224,[9] noting that the tort standard of causation was not applicable in insurance cases because insureds must show more than the minimal "but for" causation. *Id.* at 224-225, citing *Thornton, supra* at 650, and *Kangas, supra* at 17. The Supreme Court then concluded that this Court's narrow definition of "use" ignored "a major aspect of the particular 'use' to which a school bus is put":

> A school bus driver is charged both with physically carrying passengers on the bus *and* with assuring that each child is delivered to a predetermined bus stop. When this driver failed to disembark the child at the correct location, she "misused" the bus. The injuries that followed were foreseeably identifiable with the negligent decision to disembark the child at the wrong bus stop.
>
> The Court of Appeals failed to recognize the scope of the term "use" when it held that school bus use under the State Farm policy was limited to the carrying of persons in connection with school attendance. "Use" is defined more broadly than the mere carrying of persons and, while it encompasses the "operation" of the bus, it may also include a range of activity unrelated to actual driving. [*Id.* at 226 (emphasis in original).]

Importantly, the Court noted that not "all negligent acts of a school bus driver necessarily involve the 'use' of a school bus" as some circumstance will exist when the driver's negligence "is so disconnected with

---

[9] These words were relevant because Michigan Mutual's policy had an exclusion for bodily injury "arising out of the ownership, maintenance, operation, use, loading or unloading of any . . . automobile . . . ." *Id.* at 221. State Farm's policy provided coverage for bodily injury caused by an accident "arising out of the ownership, maintenance or use, including loading or unloading of" a school bus. *Id.* at 222.

the use of the school bus that the injuries suffered could not properly be said to be within the language" of the automobile insurance policy. *Id.* at 228 n 12.

Auto Owners, citing *Morosini v Citizens Ins Co of America (After Remand)*, 461 Mich 303; 602 NW2d 828 (1999), argues that the criminal acts that led to the girls' kidnapping and assault are what caused their injuries, and those criminal acts were not foreseeably identifiable injuries resulting from the negligent use of the school bus. We disagree.

In *Morosini*, the Supreme Court addressed whether an automobile insurer is liable to pay first-party no-fault benefits for the insured's injury, which resulted from an assault by a driver of another vehicle that had collided with the insured's vehicle. *Morosini, supra* at 305-306. The pertinent statutory language provided that an insurer is liable to pay benefits for injuries "arising out of the ownership, operation, maintenance or use of a motor vehicle *as a motor vehicle* . . . ." MCL 500.3105(1) (emphasis added). After reviewing cases applying that statutory language in the context of assaults,[10] the Court set forth four main principles derived from the cases:

> • Coverage is not mandated by the fact that the injury occurred within a moving vehicle, or by the fact that the driver believed that the passenger entered the vehicle for the purpose of being transported. *Thornton.*
> • The focus is on the relationship between the injury and the use of a motor vehicle as a motor vehicle, not on the intent of the assailant. *Marzonie.*

---

[10] Some of the cases discussed were *Thornton, supra, Marzonie v ACIA*, 441 Mich 522; 495 NW2d 788 (1992), *McKenzie v ACIA*, 458 Mich 214; 580 NW2d 424 (1998), and *Bourne v Farmers Ins Exchange*, 449 Mich 193; 534 NW2d 491 (1995).

- Incidental involvement of a motor vehicle does not give rise to coverage under the language enacted by the Legislature, even if assaultive behavior occurred at more than one location, and the vehicle was used to transport the victim from one place to the other. *Bourne.*
- The statute authorizes coverage in the event of an assault only if it is "closely related to the transportational function of motor vehicles." *McKenzie.* [*Id.* at 310.]

On the basis of these principles, the Court held that the assault upon the insured, which occurred after the vehicles had collided, "was not 'closely related to the transportational function of motor vehicles.'" *Id.* at 311, quoting *McKenzie, supra* at 226. See also *Bourne, supra* at 198 ("Plaintiff's injuries arose out of the blows inflicted on him by a carjacker. Hence, plaintiff suffered a personal physical attack. Generally, such an attack is not compensable."); *Wakefield, supra* at 127 (injuries resulting to a taxicab driver from an assault by a passenger were not compensable because injuries arose from allegedly negligent business decision, not the vehicle itself); *Century Mut Ins Co v League Gen Ins Co,* 213 Mich App 114, 121-122; 541 NW2d 272 (1995) (the plaintiff, who was bitten by a dog upon reaching into an automobile, was not entitled to benefits because the injury was not caused by a motor vehicle, and the vehicle was merely situs for injury); *Detroit Automobile Inter-Insurance Exchange v Higginbotham,* 95 Mich App 213, 222; 290 NW2d 414 (1980) ("An assault by an armed assailant upon the driver of a car is not the type of conduct that is foreseeably identifiable with the normal use of a motor vehicle.") (emphasis deleted).

The upshot of these no-fault cases is that "[m]ost courts find that injuries caused by assaults with dangerous weapons are not sufficiently related to the use

of a motor vehicle for no-fault benefits." *Thornton,*
*supra* at 653. However, it is clear that the statutory
"as a motor vehicle" language is significantly different
than the language in the insurance contracts at issue
here. See, e.g., *id.* at 656-657. Since this case involves
application of contractual language that is not similar
to the no-fault language at issue in such cases as
*Bourne, Wakefield,* and *Century Mut, supra,* those
cases provide no useful guidance for resolving the
present controversy. Instead, *Pacific Employers,*
which dealt with very similar "use" language regard-
ing school buses in an automobile insurance policy,
controls. See *Pacific Employers, supra* at 229 (court
noted that ordinarily an automobile insurer would not
be liable for injuries similar to those suffered by the
student after being dropped off at the wrong bus
stop).

The fact that this case involves an insurance policy
for the use of school buses, as opposed to a case
involving a no-fault policy or the no-fault statute with
respect to a motor vehicle, is a critical distinction.
Not only was this point made clear in *Pacific
Employers,* but it was likewise dispositive in *Thorn-
ton, supra.* In that case, a taxicab driver was called
by a purported customer for a ride. After picking up
the passenger, the taxicab driver was shot and
robbed. After prevailing against Allstate in the trial
court and in this Court, the plaintiff victim argued to
the Supreme Court that coverage existed under the
no-fault act because the assailant used the taxicab
business to gain access to the plaintiff. The Supreme
Court disagreed, noting that the focus under the no-
fault law was on the use of the motor vehicle as a
motor vehicle, and not as a taxicab:

> Plaintiff's argument errs because it equates the "use of a motor vehicle as a motor vehicle" with the use of a motor vehicle as a taxi. MCL 500.3105(1); MSA 24.13105(1), requires that the injury arise out of the use of the motor vehicle *as a motor vehicle.* In this case, the inherent nature of the use of a motor vehicle did not cause Mr. Thornton's injuries. Mr. Thornton was injured by a robber's gunfire. While the injuries were perhaps "foreseeably identifiable" with the occupational or commercial use of a motor vehicle as a taxicab, the relation of the gunshot wound to the functional use of a motor vehicle as a motor vehicle was at most merely "but for," incidental, and fortuitous. The mere foreseeability of an injury as an incident to a given *use* of a motor vehicle is not enough to provide no-fault coverage where the injury itself does not result from the use of the motor vehicle as a motor vehicle. [*Thornton, supra* at 661 (emphasis added in part).]

Hence, under no-fault cases such as *Thornton, Wakefield,* and *Morosini,* the focus is not on the particular use of the motor vehicle, i.e., as a taxicab in *Thornton.* However, under *Pacific Employers,* which focused on the specific language of the insurance policy, the courts *are* required to focus on the particular use of a school bus, i.e., to transport children to and from school while ensuring "that the child reaches the predetermined bus stop under the supervision of the school bus driver." *Pacific Employers, supra* at 229.

Auto-Owners argues, however, that the driver's alleged negligence was so disconnected from the kidnapping and assault on the girls such that their injuries were not foreseeably identifiable from the use of the school bus. *Pacific Employers, supra* at 228, n 12. While recognizing that Auto-Owners' argument has some appeal, we nevertheless hold that the criminal conspiracy and the subsequent carrying out of

that conspiracy were not so disconnected from the insured's use of the school bus to preclude coverage under Auto-Owners' policy.

There is no dispute in this case that the girls were dropped off at the wrong location. The evidence from the underlying lawsuit established that the girls were regularly assigned to ride the gray bus home, but that, on this day, they were transferred to the red bus. It is also undisputed that the girls were taken to two separate bus stops and were dropped off at the latter of the two stops. There was no written authorization for the girls to be dropped off at this second stop, as even the fraudulent note submitted to the district requested that the girls be dropped off at the first location, which did not occur.

It is likewise undisputed that Earl, the driver of the red bus, allowed two unidentified adult men onto the bus so they could remove the girls. At the same time, the girls verbally protested and cried over their removal from the bus by these men. Meanwhile, it is undisputed that Earl did not contact the school about the situation, did not ask either man for identification, did not ask the girls if these men were their babysitters, and did not ask anything else of the girls despite their obvious despair of being removed from the bus.

We believe these undisputed facts cause Earl's conduct in leaving the girls in the hands of strangers to fall within the definition of "use" under Auto-Owners' policy as broadly interpreted in *Pacific Employers.* This is so because the injuries the girls received, i.e., being kidnapped and assaulted, are forseeably identifiable from the decision to allow two unidentified adult men *onto the bus* to physically remove two cry-

ing and protesting elementary students. In a sense, these facts are more compelling than those in *Pacific Employers*, for unlike in *Pacific Employers*, the girls had not even left the bus when they were taken by the third parties.

The fact that the injuries were partially caused by Earl's decision, rather than directly by the bus, is of no consequence. The court in *Pacific Employers* stated:

> State Farm asserts that it is not subject to liability because it was the school bus driver's "separate, personal act of discharging Amy Doolaard at the wrong stop" and not her "use" of the school bus that caused the injuries. This is not a legally recognizable distinction, however. The school bus driver's charge included disembarking the children at predetermined bus stops, not merely transporting them to and from school. The driver "used" the school bus in doing so, even if one characterizes her conduct as a "separate and personal" act.
>
> A foreseeably identifiable injury resulting from the failure to disembark a child from the school bus at the predetermined destination is no more beyond the scope of "use" under the State Farm Policy because the separate and personal negligence of the school bus driver was involved than a foreseeably identifiable injury caused by the school bus crossing a double yellow line or going through a red light would be excluded from "use" under the State Farm policy because the separate and personal negligence of the school bus driver was involved. [*Id.* at 227-228.]

What makes this case difficult is that the note and phone call, on which school personnel relied in transferring the girls to another bus route, were fraudulent and part of a criminal conspiracy. Usually, in automobile negligence cases, intentional or criminal acts that occur in an automobile are not considered to have resulted from the "use of a motor vehicle as a motor

vehicle." *Wakefield, supra.* However, as previously noted, the *Pacific Employers* Court specifically held that because the "use" of a school bus includes ensuring "that the child reaches the predetermined bus stop under the supervision of the school bus driver," cases involving school buses are unique:

> We conclude, however, that the term "use" in the phrase "arising out of the ownership, maintenance, or use" of a school bus includes disembarking school children, especially a child at the conclusion of her first day of kindergarten, at the predetermined location. *The purpose of transporting a child by a school bus is to assure that the child reaches the predetermined bus stop under the supervision of the school bus driver.* Driver Witteveen used the bus to take Amy to the wrong place, and a foreseeably identifiable injury resulted. When a school bus driver disembarks a child at a location other than the predetermined location, the purpose of providing secure school bus transportation may, as here, be significantly defeated. [*Id.* at 229-230 (emphasis added).]

We also find instructive the decision of the Connecticut Supreme Court in *Bridgeport Bd of Ed v St Paul Fire & Marine Ins Co,* 261 Conn 37; 801 A2d 752 (2002). In that case, a seventeen-year old special education student was transported to the local high school, got out of the bus and entered the school, and then proceeded into a restroom where she was sexually assaulted by a fellow special education student who had alighted from the bus at the same time. *Id.* at 39. As a result of the assault, the student sued the school district, alleging that the bus driver's decision to allow the students to disembark from the bus without supervision was negligent. *Id.* at 40.

Thereafter, a dispute arose between the school district and its automobile insurer, St. Paul. As a result,

a breach of contract action was filed and subsequently removed to federal court. The Connecticut Supreme Court agreed to decide the following certified question from the federal court, which is essentially the same issue presented in the case at bar:

> "Under a policy of automobile insurance that provides for the 'ownership, maintenance or use' of a covered automobile, does the insurer have a duty to defend/indemnify the plaintiff board of education which has been sued by a special education student who was sexually assaulted after disembarking from a school bus?" [*Id.* at 49.]

In analyzing the issue, the court initially noted, citing *Pacific Employers*, that the term "use" in automobile policies is to be broadly interpreted. *Id.* at 43. After noting that St. Paul conceded "that delivering students safely to a particular physical location is a use of the school bus within the meaning of the policy" (the precise holding in *Pacific Employers*), the court then held that the failure of the bus driver to await disembarkment of the students until a school supervisor was present constituted the use of the bus under the insurance policy:

> We can discern no principled basis for distinguishing between a situation where a bus driver is required to discharge students safely at a specified physical location and one where the students are to be discharged safely into the care of school personnel. In both cases, the bus driver is required to use the school bus as a safety device within which the students remain until they can leave the bus safely. The negligence alleged in the Doe complaint is based upon the claim that the bus driver negligently allowed the students to alight from the bus without the supervision of school personnel. Therefore, the alleged negligent act occurred on the bus, and involved allowing the students to depart from the physical confines thereof without waiting

for school personnel to escort them into the school. [*Id.* at 44-45.]

Finally, the court rejected St. Paul's reliance on cases involving intentional assaults that fortuitously occur in automobiles,[11] concluding that the driver's negligent use of the bus was instrumental in the assault taking place:

> Such cases are unpersuasive for purposes of the present case, however, because the plaintiff's negligence in using the bus was instrumental in providing an opportunity for the assault to occur. The Doe complaint alleges that, following her departure from the school bus, Jane Doe was followed into a bathroom in the school and assaulted by a fellow special education student who also had been discharged from the bus. Had the bus driver acted in accordance with the appropriate standard of care, both Jane Doe *and* her assailant would have remained on the bus until their release into the hands of school personnel. It is precisely because of the plaintiff's alleged negligence, therefore, that Jane Doe was left, unsupervised, in the company of her assailant. Thus, this is not a case in which the allegations of the underlying complaint reveal that the injury only could have resulted from the wholly independent act of a third party. Instead, the allegations show that the negligence of the bus driver was the operative event giving rise to the assault on Jane Doe. [*Id.* at 46-47 (emphasis in original).]

We believe the Connecticut Supreme Court's decision in *Bridgeport Bd of Ed* is persuasive on the issue presented to us. As in that case, Earl's decision in this case to allow the unknown adult men onto the bus and to physically remove the girls from the bus allowed the kidnapping and assault to occur. Earl's

---

[11] One of the cases relied on by St. Paul was *Kangas, supra. Bridgeport Bd of Ed, supra* at 47 n 6.

decision to not act when faced with a situation that raised many "red flags," allowed, at least in part, the conspiracy to be successful. Therefore, we conclude that the negligent use of the bus by Earl resulted in injuries to the girls, and that the injuries were foreseeably identifiable with such use. *Pacific Employers, supra.*

Affirmed.