Agnes, Peter W., J.

INTRODUCTION

The plaintiff, Rhonda Johnson (“Johnson”), filed this action against the defendants[2] Verizon New England, Inc. (“Verizon”), Stephen Pasquale (“Pasquale”), Kenneth Weiss (“Weiss”), Peter Ravanis (“Ravanis”), and Howard White (“White”), in connection with alleged misconduct and gender discrimination at her place of employment. The Court previously dismissed Counts II, V, and VI against Verizon, Ravanis, and White. The matter is before the Court on the defendants’ motion for summary judgment as to all remaining counts.[3] For the following reasons, the defendants’ motion is ALLOWED as to all remaining counts.

BACKGROUND

The summary judgment record read in the light most favorable to the non-moving party, Johnson, is as follows: Johnson was a splice service technician for Verizon at its Brooks Street location in Worcester between May 1996 and June 2004. She was the only female member of her crew and one of two females working with over one hundred males at the facility. Pasquale and Weiss were among her work colleagues on her night shift. Johnson became friends with Pasquale and Weiss both at and outside of work. As part of their friendship dynamic, they regularly teased one another, exchanged jokes, and engaged in horseplay that included disconnecting each other’s telephones and portable computerized devices (commonly known as CATs). Johnson actively participated in those activities and never complained that she found any of the teasing, joking, or horseplay to be offensive until June 2004. At one point, however, Johnson asked for Pasquale’s advice on handling another coworker’s remarks, which she had interpreted as de-rogatoiy towards women. She followed his advice and spoke to the co-worker, who apologized, indicated he meant no offense, and did not bother her again. The incident was never reported to Verizon.
In addition, Johnson and Pasquale worked together in various remote locations. Pasquale’s wife also became a friend of Johnson and frequently exchanged books with her. Also, Pasquale sought help from Johnson in performing carpentry work at his home. Similarly, Johnson and Weiss attended a co-worker’s wedding together with Weiss’ wife.
In finishing a typical shift at work, Johnson and her colleagues would proceed to Verizon’s facility in Worcester, complete paperwork, and transfer dispatch data using their CAT devices. On one particular occasion in September 2003, Johnson arrived at the facility to complete her duties for the day. When she noticed Pasquale was operating his CAT device, she shut off the power to the CAT. She then proceeded to make a telephone call, during which Pasquale depressed the hang-up button. Pasquale and Weiss continued to prevent her from placing the call a few more times. Pasquale also unplugged the cord from Johnson’s telephone two times. Johnson and Pasquale then engaged in a “tug of war” with the phone cord as other colleagues watched and laughed. Both Johnson and Pasquale were pulling and tugging on the cord. Johnson pulled the cord, leaning back toward her seat, at which point the cord came free of Pasquale’s hands.[4] Johnson fell onto the floor, rather than in her chair, landing on her buttocks and bruising her tailbone. Weiss had allegedly moved away her chair. She then got up and sat in a seat until she left for the day.
Johnson went to the hospital the next day for treatment for her injured tailbone. She informed her supervisor, Ravanis, that she had been injured during some horseplay and tug of war while on the job, but did not divulge the identities of the other co-workers involved. She remained out of work for approximately two months, during which time she received workers’ compensation benefits. Pasquale communicated with Johnson from time-to-time to inquire as to her well-being. However, Johnson claims that sometime after she returned to her job, a conversation amongst her co-workers occurred, during which the subject of overtime work opportunities, leaving early, and the need for a supervisor were discussed. At that time, Weiss told her that she should be “knocked on [her] ass again” and stated that “she doesn’t get it.”
Johnson suffered a subsequent injury while exercising at her local gym a short time later. She stayed out of work until June 2004 while on short-term disability. When she returned to work, Pasquale had installed a sign on her truck, which read “Caution: Blonde at Work.” Johnson was amused by the sign and left it there.
On June 10, 2004, Johnson was given a special assignment. She arrived at the wrong location that day and telephoned Pasquale, who told her that the assignment was cancelled and given to him instead because she did not have the qualifications necessary for the type of work involved. Pasquale then met with Johnson at the correct location; they argued with one another on the issue of Johnson’s qualifications for the assignment. Johnson accused Pasquale of taking her off of the assignment, though he did not have authority to do so. They continued to argue when they returned to the Worcester facility that evening. Pasquale was irritated by Johnson’s reaction and told *42 her that she was acting as though she had more experience than she actually did, that she had a “twenty year attitude,” and that she “[did] not know [her] place.” He indicated that she should nó longer ask her co-workers for assistance. It is alleged that Pasquale also told her that “maybe [he did] need to knock [her] on [her] ass again.”
After that conversation, Johnson informed her second level manager, White, of the incidents with Pasquale and Weiss. In particular, White was unaware of the tug of war incident the year before. She also told her story to Gary Daly (“Daly”), a union representative, by telephone. White arranged a meeting with Daly, Johnson, Weiss, Pasquale, and Sue Desy (“Desy”), a management representative, for later that day. During the meeting, Johnson told Pasquale and Weiss that they had upset her, that she no longer felt safe as their co-worker, and that she wished them to stay away from her. Both Pasquale and Weiss agreed to leave her alone and left the meeting. They did not communicate or interact with her again after that time. She also indicated her feelings to White that her mistreatment by Pasquale and Weiss was due to her gender. White asked Johnson to write him a written report of what happened during the tug of war incident and her later conflicts with Pasquale and Weiss.
At the end of June, Johnson asked Ravanis if he recalled her injury in 2003, though she had not spoken to him of it or any other incidents involving Pasquale or Weiss since that time. Ravanis remembered Johnson telling him that she fell on her tailbone when she went to sit down in her seat, which she did not realize was not there. In addition, Johnson asked White to appoint a night supervisor, as she was fearful of working at the facility where Pasquale and Weiss could be present. White suggested that Jeff Clarkson (“Clarkson”) should serve as the supervisor and that Johnson work an alternative shift arrangement, including a day shift. Johnson and Clarkson had previously worked with one another that year. They worked together well and without problems. However, Johnson declined White’s offer. While driving to work the following morning, Johnson suffered a panic attack out of her concern over the prospect of Clarkson becoming the night shift supervisor — she was concerned about his alleged friendship with Pasquale and Weiss. She did not arrive at work that day and has not been to work since then. Johnson formally resigned from Verizon in June 2005.
Verizon security personnel had investigated Johnson’s allegations concerning her workplace conditions, fears, and behavior of Pasquale and Weiss. They interviewed numerous co-workers, including White, Ravanis, Pasquale, Weiss. However, Verizon was unable to verify that Pasquale or Weiss had intentionally injured Johnson or that Johnson was a victim of gender harassment.
However, Johnson filed a discrimination complaint with the Massachusetts Commission Against Discrimination (“MCAD”) in July 2004. She also began receiving psychological counseling from a therapist. Their discussions included Johnson’s prior marriage, her ex-husband’s cocaine and alcohol addiction, sexual abuse from her uncle, and her mother’s pain medication and alcohol addiction. Johnson was given prescriptions for Zoloft to combat her anxiety and depression, though she did not use the medication due to her family histoiy of addiction. Over time, she began to improve and successfully changed careers.
Johnson also requested to receive workers’ compensation benefits in 2004. Kate Fecteau, Verizon’s claims administrator, handled the request. She obtained all the necessary information to process Johnson’s claim and received cooperation from all Verizon personnel with whom she spoke regarding the matter. Johnson received full payment of the benefits in August 2005, over a year after her benefits request.

DISCUSSION

I. Summary Judgment Standard

Summary judgment shall be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c)); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law, Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
II. Counts I and II — Assault and Battery (Pasquale and Weiss[5])
Johnson alleges assault and battery against Pasquale and battery against Weiss in connection with their involvement in the tug of war incident, which resulted her tailbone injury. A defendant is liable for assault if he intentionally acted to cause a harmful or offensive physical contact with the plaintiff and, as a result, the plaintiff was put in reasonable apprehension of an immediate physical harm. See Ross v. Michael, 246 Mass. 126, 130 (1923); Dahms v. Cognex Corp., Civil No. 993192, (Middlesex Super.Ct. November 20, 2000) (Garsh, J.) [12 Mass. L. Rptr. 486]. The defendant will also be liable for battery if the harmful or offensive physical contact ultimately results, whether directly or indirectly, from that intentional conduct. See Waters v. Blackshear, 412 Mass. 589, 590-91 (1992) (battery is an act intended to cause a harmful or offensive contact with the plaintiff, which *43 contact directly or indirectly results). The defendant’s conduct is considered intentional if “the act [was] done for the purpose of accomplishing the result or with knowledge that to a substantial certainty such a result will ensue.” Id. at 591 (citations omitted).

A. Consent to Recreational Activity

Massachusetts has joined the majority of jurisdictions in holding that a person who participates voluntarily in a recreational activity or organized sport has consented to certain types of injury-causing physical contact from intentional or negligent acts that are committed during the course of the recreational activity or organized sport, and may recover damages only for those injuries that are the result of wanton or reckless conduct. “As a general rule, participants properly may be held to have consented, by their participation, to those injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation.” Ritchie-Gamester v. City of Berkley, 461 Mich. 73, 84, 597 N.W.2d 517, 522 (1999) (stating the majority rule). As the Supreme Judicial Court put it, “(p]layers, when they engage in sport, agree to undergo some physical contacts which could amount to assault and battery absent the players’ consent.” Gauvin v. Clark, 404 Mass. 450, 454 (1989). See also Gray v. Giroux, 49 Mass.App.Ct. 436, 439 (2000) (plaintiff could not recover for injury from another golfer’s drive, as the standard of care was willful, wanton, or reckless conduct). Although the tug of war involved in this case was not part of a competitive or formal athletic context, it was nevertheless a recreational activity in which the plaintiff chose to participate with her friends and coworkers and in which physical contact is an integral part. The standard of care in recreational activities is willful, wanton, or reckless even when those activities do not have definable rules or customs recognized by the greater community. Moe v. Doe, 63 Mass.App.Ct. 516, 519-21 (2005) (plaintiff could not recover for injury resulting from the defendant’s movements during consensual sexual activity with the plaintiff absent a showing of defendant’s willful, wanton, or reckless conduct).
Decisions from other jurisdictions which have confronted similar circumstances are instructive. See e.g., Hellriegel v. Throll, 417 P.2d 362, 367-68 (Wash. 1966) (“Persons who engage in roughhouse horseplay . . . accept the risk of accidental injuries which result from participation.”); State v. Shelley, 929 P.2d 489 (Wash.Ct.App. 1997) (injuiy during informal game of basketball; consent may be a defense). As the Supreme Court of Michigan explained:
“A person who engages in a recreational activity is temporarily adopting a set of rules that define that particular pastime or sport. In many instances, the person is also suspending the rules that normally govern everyday life. For example, it would be a breach of etiquette, and possibly the law, to battle with other shoppers for a particularly juicy orange in the grocery store, while it is quite within the rules of basketball to battle for a rebound. Some might find certain sports, such as boxing or football, too rough for their own tastes. However, our society recognizes that there are benefits to recreational activity, and we permit individuals to agree to rules and conduct that would otherwise be prohibited ... The act of stepping onto the field of play may be described a ‘consent to the inherent risks of the activity,’ or a participant’s knowledge of the rules of a game may be described as ‘notice’ sufficient to discharge the other participants’ duty of care . . .” No matter what terms are used, the basic premise is the same: When people engage in a recreational activity, they have voluntarily subjected themselves to certain risks inherent in that activity. When one of those risks results in injury, the participant has no ground for complaint.
Ritchie-Gamester v. City of Berkley, 461 Mich. 73, 86, 597 N.W.2d 517, 523-24 (1999) (emphasis added), .relying on Feigner v. Anderson, 133 N.W.2d 136 (1965).
The plaintiff freely and voluntarily participated in a tug of war with co-workers with the result that she fell backwards and injured herself. The evidence viewed in the light most favorable to the plaintiff shows nothing more than conduct commonly and routinely associated with the activity known as tug of war and thus cannot be regarded as reckless. See Ritchie-Gamster, supra, 461 Mich. at 90 n.10, 597 N.W.2d at 525 n. 10. The plaintiff did not allege in her complaint that she was injured as a result of wanton and reckless conduct. Thus, her claims for assault and batteiy cannot withstand a motion for summary judgment.
It is regrettable that the plaintiff suffered an injury. The law does not condone such conduct on her part or on the part of her co-workers. But neither does the law provide her with a remedy in circumstances such as these. In the words of Justice Benjamin Cardozo:
One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary, just as a fencer accepts the risk of a thrust by his antagonist or a spectator at a ball game the chance of contact with the ball. The antics of the clown are not the paces of the cloistered cleric. The rough and boisterous joke, the horseplay of the crowd, evokes its own guffaws, but they are not the pleasures of tranquility. The plaintiff was not seeking a retreat for meditation. Visitors were tumbling about the belt to the merriment of onlookers when he made his choice to join them. He took the chance of a like fate, with whatever damage to his body might ensue from such a fall. The timorous may stay at home.
* * *
Nothing happened to the plaintiff except what common experience tells us may happen at any time as *44 the consequence of a sudden fall. Many a skater or a horseman can rehearse a tale of equal woe . . . One might as well say that a skating rink should be abandoned because skaters sometimes fall.
Murphy v. Steeplechase Amusement Co., 250 N.Y. 479, 482-83, 166 N.E. 173 (1929) (citations omitted). See also Ritchie-Gamester, supra, 461 Mich. at 88, 597 N.W.2d at 524 (“Justice Cardozo’s observations apply just as well to the conduct of co-participants in a recreational activity as they do to the conduct of a person enjoying an amusement park ride. Indeed, while most of the cited cases have addressed contact sports or team sports, Justice Cardozo’s comments help illustrate that the same general analysis applies to non-contact and individual recreational activities. In all these activities, there are foreseeable, built-in risks of harm”).

B. Evidence Insufficient to Permit a Finding of Assault and Battery

Alternatively, a review of the record alone reveals that no reasonable juiy could conclude that Pasquale intended to produce an immediate harmful or offensive contact upon Johnson. Their friendship and the history of frequent and lighthearted office antics that Johnson had grown accustomed to has not been met by sufficient countervailing evidence that, at the time of the incident, Pasquale acted in a manner calculated to depart from their usual reciprocal tomfoolery and threaten Johnson’s physical well-being or bodily integrity. There is little, if anything, to suggest that Johnson’s horseplay and tug of war with Pasquale were fundamentally different than that which Johnson should ordinarily have expected or that the risk of physical hazards in that activity were exacerbated or otherwise heightened by Pasquale’s conduct. For example, it is not clear that Pasquale purposely let go of the cord so that Johnson would fall. No specific evidence suggests that circumstance. Rather, the record merely establishes that Pasquale had playfully reacted to Johnson’s own playfulness towards him when she initially shut off his CAT device and he disconnected her phone calls. As the source of the horseplay and ensuing tug of war with the phone cord, Johnson cannot characterize Pasquale’s behavior as the sort of deliberate aggressiveness normally involved in an assault and battery without more than the mere fact of Pasquale’s pulling at and sudden release of her phone. See note 4, supra
Similarly, the record does not raise a reasonable inference that Weiss battered Johnson. Weiss’ actual involvement in moving Johnson’s chair is a source of contention between the parties. However, Johnson has not offered sufficient evidence from which it may be concluded or inferred that Weiss had a specific purpose to harm Johnson or that he was in a position to know to a substantial certainty that she would fall to the floor as a result of engaging in horseplay — that Pasquale would purposely release the cord so that she would fall such that removing her chair would cause injury. Accordingly, even if Weiss, indeed, had moved the chair, his intent to produce a battery upon Johnson is not shown in the record.
Therefore, summary judgment is allowed in favor of Pasquale and Weiss as to Counts I and II of Johnson’s complaint.
III. Counts TV, VII, and VIII — Intentional Infliction of Emotional Distress and Gender Harassment/Discrimination under G.L.c. 15IB (Pasquale and Weiss)

A. Intentional Infliction of Emotional Distress

Johnson also brings a claim for intentional infliction of emotional distress against both Pasquale and Weiss. As the basis of her claim, she cites their involvement in her tug of war injury and their controversial remarks, such as that they should “knock [her] on [her] ass again,” that she had a “twenty year attitude,” and that she “[did] not know her place.” To recover for intentional infliction of emotional distress, the plaintiff must prove “(1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct ... (2) that the defendant’s conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiffs distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.” Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 465-66 (1997), quoting Payton v. Abbott Labs, 386 Mass. 540, 555 (1982).
However, Johnson cannot prove the essential elements of this claim on the facts as presented to the Court. Even while drawing all reasonable inferences in Johnson’s favor, there is insufficient evidence to raise a genuine dispute of fact as to Pasquale and Weiss’ intentions to cause her emotional injury. The defendants rightly suggest there are significant factors which establish that Pasquale and Weiss did not aim to cause Johnson emotional distress either with their remarks or during the horseplay. Their remarks cannot be seen as intended personal attacks, as they arose during a work-related argument over qualifications for special assignments and referenced the tug of war incident in which Johnson, their longtime friend, willfully participated. Where Johnson herself contributed to the consistent joking, repartee, and teasing between herself and her co-workers throughout the years, a reasonable jury would not conclude that Pasquale’s or Weiss’ remarks were so “extraordinary,” as the defendants put it, that a malevolent intent to emotionally injure Johnson was the underlying motivation. To the extent that their comments were designed to be insulting, it is settled that “[liability cannot be predicated on ‘mere insults, indignities, threats, annoyances, petty oppressions or other *45 trivialities’ nor even is it enough ‘that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by ’’malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.’ “ Tetrault, 425 Mass. at 466, quoting Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987), quoting Restatement (Second) of Torts §46 comment d (1965).
Johnson’s argument that Pasquale’s and Weiss’ behavior was “extreme and outrageous” is similarly unconvincing. The defendants are correct that the comments spoken by the defendants, and the circumstances under which they were made, are not of the sort that compen-sable emotional distress claims typically embrace. See e.g. Bowman v. Heller, 420 Mass. 517, 521-27 (1995) (conduct was extreme and outrageous where plaintiffs face was inserted into pornographic images and then circulated); Boyle v. Weak, 378 Mass. 592, 594-98 (1979) (defendant repeatedly and rudely contacted plaintiff to get information from her with knowledge that she was in a weakened condition from recently having been hospitalized). While Pasquale’s and Weiss’ comments were distasteful, immature, or unwarranted, it would strain common sense that a jury would conclude they meet the standard of “beyond all possible bounds of decency and utterly intolerable in a civilized community.” Tetrault, 425 Mass. 465-66. As for evidence of a connection between the defendants’ conduct and her alleged severe emotional distress, Johnson relies primarily on her panic attack episode and therapy sessions. However, in light of her family history of sexual and drug abuse, and later her successful transition into a new career after leaving Verizon, no reasonable jury could find that severe emotional distress resulted from her interactions with Pasquale and Weiss without more support. Pasquale and Weiss are, therefore, entitled to judgment as a matter of law with respect to Count IV of Johnson’s complaint.

B. Gender Harassment/Discrimination

The Court concludes that Johnson cannot recover for gender harassment under G.L.c. 151B for largely the same reasons that her claim for intentional infliction of emotional distress is unsustainable. The core of her claim is that Pasquale’s and Weiss’ behavior constituted harassment and was directed toward her because of her gender, as she was the only female on her crew. General laws chapter 15 IB is designed to protect individuals for gender discrimination and harassment in the workplace. See G.L.c. 15 1B.[6]To prevail under section 4(1), Johnson must prove that “she was subjected to unwelcome sexual advances or remarks in a work environment where she was intimidated, humiliated, or stigmatized because of an abusive atmosphere.” Fluet v. Harvard Univ., Civil No. 97-SEM-0690, 23 MDLR 145 (MCAD 2001). Specifically, she must show that (1) she is a member of a protected class; (2) because of her membership in that class, she was the target of unwelcome speech or conduct that was both objectively and subjectively offensive or sexually demeaning; (3) she was capable of performing the responsibilities of her job; (4) the speech or conduct was sufficiently severe or pervasive to adversely affect or alter the terms or conditions of her employment and create an abusive work environment; and (5) the harassment was earned out by an employee(s) with a supervisory relationship to her, or the employer knew or should have known of the harassment and failed to take prompt remedial action. Id.; Eggert v. Cabot Corp., Civil No. 94-BEM-1568, 21 MDLR 131 (MCAD 1999); Murphy v. Pub Ventures, Ltd., Civil No. 88-BEM-0779, 15 MDLR 1098 (MCAD 1993). See also G.L.c. 151B, §4(1); College-Town, Div. of Interco, Inc. v. Massachusetts Comm’n Against Discrim., 400 Mass. 156, 163-67(1987); Ritchie v. Department of State Police, 60 Mass.App.Ct. 655, 660 (2004), quoting Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 532 (2001) (sexual/gender harassment requires “perva(sive) harassment or abuse resulting [in] intimidation, humiliation or stigmatization that poses a formidable barrier to full participation of an individual in the workplace”). The statute also makes it unlawful “[flor any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter.” G.L.c. 151B,§4(4A).
Johnson cannot show that the conduct or remarks were directed against her because she is a woman, that they were objectively and subjectively offensive, intimidating, threatening, coercive, or sexually demeaning, or that an abusive or hostile work environment was created.
The fact that she was the only female member of her shift and one of only two women at the facility is insufficient to raise a reasonable inference that any of the alleged misconduct or remarks made by Pasquale and Weiss may be attributed to her gender when juxtaposed to the undisputed evidence of the circumstances surrounding the tug of war incident and the details of her friendship with both defendants. See Perini/Kiewit/Cashman v. Massachusetts Comm’n Against Discrimination, Civil No. 045322 (Suffolk Super.Ct. July 27, 2006) (Connolly, J.) [21 Conn. L. Rptr. 297] (male-dominated employment field not enough to demonstrate gender discrimination or harassment). The tug of war incident is essentially the origin and reference point of her entire dispute with Pasquale and Weiss, as the record shows no previous history of gender harassment or discrimination by those defendants, but rather a long standing friendship in and out of the workplace and with the defendants’ spouses.
The incident itself arose by virtue of Johnson’s unprovoked decision to abruptly shut down Pasquale’s CAT device. Pasquale’s immediate and sub *46 sequent interference with Johnson’s calls and pulling at the phone cord was elicited, not random; reciprocal, not unilateral. Accordingly, it cannot reasonably be concluded that Pasquale was independently motivated by a recognition of Johnson’s status as a woman. Similarly, the record shows that Weiss’ conduct in moving Johnson’s chair, even if true, came in reaction to witnessing the mischief between Johnson and Pasquale. A conclusion that he decided to join in the fray against Johnson solely because she is a woman would be purely speculative without support from the sequence of events resulting in the tug of war injury, making summary judgment appropriate for Weiss. See Chaffee v. Department of Corr., Civil No. 021908 (Worcester Super.Ct. December 20, 2006) (Billings, J.) [22 Conn. L. Rptr. 150] (“Summary judgment is appropriate in employment discrimination cases where the party resisting judgment rests merely upon conclus-oxy allegations, improbable inferences, and unsupported speculation”), relying on Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 38 (2005).
In addition, the controversial remarks are insufficient for a reasonable jury to find gender harassment, discrimination, or an otherwise abusive or hostile workplace environment. As the defendants point out, the remarks themselves were gender neutral if not ambiguous. They occurred during an argument pertaining to special work assignments, an isolated occurrence. Isolated or ambiguous remarks are not sufficient to prove discrimination or harassment. See Tardanico v. Aetna Life & Cas. Co., 41 Mass.App.Ct. 443, 450 (1996), review denied, 423 Mass. 114 (1996) (statements that plaintiff “had been around for a long time” and that his “bag was getting too heavy” were not clearly connected to age and, without more, were not enough to prove age discrimination). At most, they made reference to the tug of war injury (i.e. “knock her on her ass again"), which the record shows did not independently arise because of any malice or hostility toward Johnson. The “Caution: Blonde at Work” sign is the only remark by Pasquale and Weiss in which an acknowledgment of Johnson’s physical appearance factored into their workplace teasing. Still, however, Johnson found that comment amusing and left up the sign, having never complained about it, a circumstance which refutes the notion that she considered her workplace to be a hostile work environment. Therefore, Pasquale and Weiss are entitled to summary judgment as to Johnson’s gender harassment and discrimination claims.
IV. Counts IX, X, and XJ — Gender Discrimination and Aiding and Abetting Gender Discrimination
Johnson makes similar gender discrimination and harassment claims against White, Ravanis, and Verizon. She claims that those defendants had notice of the alleged gender discrimination and harassment by Pasquale and Weiss, but failed to take appropriate remedial steps. An employer may be liable under G.L.c. 15 IB for the conduct of supervisors or employees who have created a sexually harassing or hostile workplace environment where the employer was put on notice of the misconduct, but failed to take steps to adequately resolve the situation. See College-Town, 400 Mass. at 162-63. See also Chaffee v. Department of Corr., Civil No. 021908 (Worcester Super.Ct. December 20, 2006) (Billings, J.) [22 Mass. L. Rptr. 150).
The parties dispute when it was that Ravanis, and by extension, Verizon, was made aware of possible gender harassment or discrimination against Johnson by Pasquale and Weiss. Johnson informed Ravanis of the 2003 tug of war incident, but did not identify the names of the offenders. Neither Johnson’s nor Ravanis’ deposition shows that she told Ravanis that she believed that Pasquale and Weiss were harassing her because of her gender. Instead, she concludes that Verizon was put on notice of gender harassment because Ravanis was aware that she was the only woman in her shift and that the two offenders were male. However, it is questionable, if not unlikely, that a jury would conclude that Ravanis had notice of gender discrimination based only on that circumstantial evidence, particularly where no other history of gender harassment existed between Johnson and her coworkers.
Furthermore, it is undisputed that she later informed White, Daly, and Desy of that event and the subsequent controversial remarks made by Pasquale and Weiss, as well as her belief that she was suffering from gender discrimination. Her special meeting with those parties resulted in a promise by Pasquale and Weiss to avoid further contact with Johnson, which they honored. Johnson was also given the opportunity to work a different shift and to have a supervisor appointed to her shift. Therefore, it cannot be concluded that White, Ravanis, and Verizon failed to take any steps to remedy the conflict between Johnson, Pasquale, and Weiss. Those steps would have been more than adequate to resolve the workplace problems given that she would no longer be interacting with Pasquale and Weiss and would enjoy the benefit of supervision if the occasion were to arise.
Johnson also claims that White, Ravanis, and Verizon are liable for aiding and abetting gender discrimination in violation of G.L.c. 151B, §4(5).[7] To prevail, Johnson must prove that they (1) committed a “wholly individual and distinct wrong,” which is “separate the [discrimination] claim in the main,” (2) “that [they] shared an intent to discriminate not unlike that of the alleged principal offender[s],” and (3) that they “knew of [their] supporting role in an enterprise designed to deprive [Johnson] of a right guaranteed . . . her under G.L.c. 15 IB.” Harmon v. Malden Hosp., Civil No. 96-BEM-1146, 19 MDLR 157, 157-58 (MCAD 1997). See also Beaupre v. Smith & Assocs., 50 Mass.App.Ct. 480, 490-91 n. 18 (2000). However, Johnson’s claim fails on *47 two levels. First, the record does not indicate that White, Ravanis, or Verizon affirmatively harassed or otherwise intended or enabled harassment or discrimination against Johnson. To the contraiy, there is evidence of their attempt to address Johnson’s workplace concerns and complaints in their holding of meetings and discussions with the interested parties about the issues and in their willingness to adjust Johnson’s work schedule and provide supervision. Second, as discussed above, Johnson cannot prevail on her underlying claim of harassment discrimination against Pasquale and Weiss. There cannot be liability for aiding and abetting discrimination unless there is liability for the discrimination itself. See Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 122 (2000) (claim of aiding and abetting discrimination is derivative of underlying discrimination claim). Accordingly, White, Ravanis, and Verizon are entitled to summary judgment as to the aiding and abetting discrimination claims.
V Cowits XII and XIII — Retaliation (White and Verizon)
Johnson also claims that White and Verizon have violated G.L.c. 151B, §§4(1) and 4(4A) by committing unlawful “retaliation” against her after she complained about Pasquale and Weiss to White. To establish a prima facie case for retaliation, Johnson must show that (1) she “engaged in protected conduct”; (2) “that [she] suffered some adverse action”; and (3) “that a causal connection existed between the protected conduct and the adverse action.” Mole v. University of Massachusetts, 442 Mass. 582, 591 (2004). She must also show that she had a reasonable and good faith belief that the defendants engaged in conduct that violates G.L.c. 151B. See Tate v. Department of Mental Health, 419 Mass. 356, 364 (1995); Ritchie, 60 Mass.App.Ct. at 664.
Here, Johnson informed Ravanis, White, and other personnel of her alleged problems with Pasquale and Weiss. She later filed an MCAD complaint. Thus, she may have an arguable basis to establish that she engaged in protected conduct. See Ritchie, 60 Mass.App.Ct. at 664-65 (while filing a formal MCAD complaint is protected activity under G.L.c. 15 IB, other conduct may qualify, including complaining to management, filing an internal complaint, or meeting with co-workers to resolve harassment issues).
However, Johnson cannot satisfy the remaining criteria, thereby entitling White and Verizon to summary judgment. She is unable to show that she suffered adverse action, which requires a showing that there was a change(s) “in working conditions that create[d] a material disadvantage in IJohnsoris] employment.” Id. at 665, quoting Flanagan-Uusitalo v. D.T. Indus., Inc., 190 F.Sup.2d 105, 116 (D.Mass. 2001). White’s offers to adjust Johnson’s work shift schedule and to appoint Clarkson as her new supervisor are not so adverse to her terms of employment that she would have been materially disadvantaged had she accepted them. As the defendants suggest, those proposed arrangements had not to do with changes in her salary, rank, position, or terms of employment. MacCormack v. Boston Edison Co., 423 Mass. 652, 663 (1996) (adverse employment action “disadvantage[s] [the plaintiff] in respect to salary, grade, or other objective terms and conditions of employment”). It stands to reason that upon learning of potential gender harassment or physical threats directed towards one of its employees, an employer would recommend that the affected employee be reassigned to avoid further contact with the offenders or that the offenders be supervised in the alternative. However unsatisfactory or inadequate those remedies appeared to Johnson, there is no indication that she would have been unable to successfully perform her duties or otherwise enjoy the same benefits of employment.[8] See id. at 663-64 (“subjective feelings of disappointment and disillusionment” in employer’s decisions do not show adverse employment action). Furthermore, possible remedies which have not been put into effect, like those here, have not materially disadvantaged an employee for purposes of retaliation claims. See Goguen v. Quality Plan Adm’rs., Civil No. 975874, 2000 (Middlesex Super.Ct. Feb. 11, 2000) (Gershengom, J.) [11 Conn. L. Rptr. 288] (employee was not materially disadvantaged by employer’s “threat” that employee take on a two and one-half (2.5) hour commute, as it was never effected).
In addition, Johnson’s allegations that Verizon interfered with and purposely failed to timely process her workers’ compensation benefits are largely unsubstantiated by the record. Although she did not receive the benefits for over a year, Johnson admitted that Kate Fecteau gathered the necessary information to process her claim and that she received full payment in August 2005. She also admitted that all Verizon personnel with whom Kate Fecteau spoke cooperated in processing the claim. Those facts warrant a finding by a reasonable jury that Verizon did not have or put into effect a purposeful design to delay payment of Johnson’s benefits, let alone intend such a delay in retaliation for her complaints about Pasquale and Weiss. Accordingly, White and Verizon are entitled to summary judgment as to Counts XII and XIII of Johnson’s complaint.
VL Count XIV — Constructive Discharge (Verizon)
Johnson’s final claim is for constructive discharge against Verizon. Under Massachusetts law, “[a] ‘constructive discharge occurs when the employer’s conduct effectively forces an employee to resign...’” GTE Prods. Corp. v. Stewart, 421 Mass. 22, 33-34 (1995), quoting Turner v. Anheuser-Busch, Inc., 7 Cal. 4th 1238, 1244-45 (1994). “The test is met if, based on an objective assessment of the conditions under which the employee has asserted he was expected to work, it could be found they were so difficult as to be intolerable.” GTE Prods. Corp., 421 Mass. at 34.
Johnson bases her constructive discharge allegations primarily on the fact that she experienced her panic attack after having met with White the day before to discuss her conflicts with Pasquale and Weiss. Johnson *48 declined White’s offers to change shifts or have Clar-kson appointed as a supervisor and thereafter suffered the panic attack due to anxiety about Clarkson’s alleged friendship with Pasquale and Weiss. However, such circumstances, without more, do not warrant the conclusion that a reasonable person would feel compelled to resign from his or her employment.
Johnson’s suffering of a panic attack on one occasion is an unfortunate occurrence. That it occurred proximately to her meeting with White suggests its relationship to her stated concerns regarding her view of her work environment with Pasquale, Weiss, and potentially Clarkson. Nevertheless, in view of the totality of the circumstances, it was a subjective reaction. The possible ramifications of Clarkson’s supervision are largely speculative. No evidence has been presented to indicate if or how that would impact her physical safety let alone Pasquale’s and Weiss’ inclination to disturb or harass her there is only speculation. See Chaffee v. Department of Corr., Civil No. 021908 (Worcester Super. Ct. December 20, 2006) (Billings, J.) [22 Mass. L. Rptr. 150] (summary judgment appropriate for defendant where plaintiff bases claims on conclusory allegations or unsupported speculation). Rather, it is undisputed that after meeting with White, Daly, and Johnson, neither Pasquale or Weiss communicated with Johnson again, honoring their promise to leave her alone. Johnson also worked with Clarkson that same year — they worked together well and no problems occurred.
There is no other objective evidence that a reasonable person would find the situation “so difficult as to be intolerable.” GTE Prods. Corp., 421 Mass. at 34. Johnson herself acknowledges in her memorandum that “the trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee’s shoes would have felt compelled to resign.” GTE Prods. Corp., 421 Mass. at 34, quoting Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir. 1977). Aside from the tug of war incident, there is no history of violence or legitimate threats of violence against Johnson indicated in the record. Although “a single intolerable incident, such as a crime of violence against an employee... may constitute a constructive discharge,” the tug of war skirmish is not fairly characterized as a crime of violence or aggravated misconduct in light of Johnson’s friendship with Pasquale and Weiss before and after that incident. See Turner, 7 Cal. 4th at 1247 n.3. Moreover, the comments that she didn’t “know her place,” had a “twenty year attitude,” and that she should be knocked “on her ass” do not take on an overtly threatening character or constitute a continuous pattern of abuse merely because of the defendants’ role in the production of Johnson’s first injury. As discussed supra, Johnson was a willing participant, if not co-instigator, of that episode. In addition, some of the comments were borne out of arguments regarding work assignments and, thus, are not connected to Johnson’s injuries. They were also consistent with the sort of jibes to which Johnson had not taken offense, such as the quip about her having blonde hair.
Therefore, on the facts as presented to the Court, Johnson’s compulsion to resign is not a viable inference or conclusion without more objective evidence of intolerable working conditions, particularly where Johnson was given the opportunity to move to a different shift without Pasquale or Weiss. Cf. Salvi v. Suffolk County Sheriff's Dept., 67 Mass.App.Ct. 596, 607 (2006) (looking objectively at plaintiffs working conditions, constructive discharge occurred where plaintiff suffered persistent rumors of his sexual orientation, undesirable assignments, slurs and shunning, unsuccessful pursuit of administrative remedies, and deterioration of mental health). Accordingly, Verizon is entitled to summary judgment as to Count XIV of Johnson’s complaint.

ORDER

For the foregoing reasons, it is hereby ORDERED that the defendants’ motion for summary judgment be ALLOWED.

Collectively “the defendants.”

Counts IX, X, XI, XII, and XIV remain as to Verizon, Ravanis, and White. Counts I, II, IV, VII, and VIII remain as to Pasquale and Weiss.

It is not possible to state with precision what caused the plaintiff to fall backwards i.e., whether she pulled free, whether Pasquale let go of the cord, or some combination of the two actions. See Defendants’ Statement of Undisputed Material Facts, paragraphs 17-19. Although Johnson states that Pasquale let go of the cord, she also concedes that her fall was the result, at least in part, of her own actions in pulling the cord and leaning backwards. See Joint Appendix, Exh. D, Johnson Deposition IIA at 245.

Batteiy only.

Section 4 states:
It shall be an unlawful practice:
1. For an employer, by himself or his agent, because of the race, color, religious creed, national origin, sex, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, genetic information, or ancestry of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such Individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.
G.L.c. 15IB, §4(1).
The Court notes that, for some purposes, the statute may be preempted by federal law. See Partners Healthcare Sys., Inc. v. Sullivan, No. 06-11436JLT (D.Mass. July 31, 2007).

Section 4(5) makes it unlawful for “any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under G.L.c. 151B or to attempt to do so.” G.L.c. 151B, §4(5).

Therefore, it is also unreasonable for Johnson to characterize White and Verizon’s willingness to move Johnson to another shift or provide her with supervision as “retaliation” or punishment for reporting her conflicts with Pasquale and Weiss.